AMERICAN INDUSTRIES CORP.,
Plaintiff,

v.

M.V. MARGARITE, her engines,
boilers, etc.

v.

SOUTHERN CROSS STEAMSHIP CO.,
INC. and Atlantic Shipping Company,
S.A., Defendants.

No. 75 Civ. 5292.

United States District Court,
S.D. New York.

July 16, 1981.

See also D. C., 556 F.Supp. 216.

Bigham, Englar, Jones & Houston, New York City, for plaintiff.

Cichanowicz & Callan, New York City, for defendants.

## MEMORANDUM OPINION and ORDER

LOWE, District Judge.

This is an admiralty action by American Industries Corp. ("AMI"), an American steel importer, to recover for water damage to 280 coils galvanized steel.[1] The steel was allegedly purchased from a German supplier, and shipped by barge FOB Port of Antwerp, Belgium. It was temporarily stored in a dockside warehouse and then loaded onto the M.V. Margarite, owned by defendant Southern Cross Steamship Company, Inc. ("Carrier") then under time charter to defendant Atlantic Shipping Company, Inc. ("Charterer"). The Court, prior to trial, entered judgment of default against the charterer, leaving only the carrier company as defendant. The coils were discharged at Philadelphia and taken by truck to Jersey City where they were found to be extensively water damaged.

AMI pleads two alternative theories for recovery. First it claims that defendants issued a fraudulent bill of lading upon which plaintiff relied to its detriment. Second it alleges negligent carriage.

## I. BACKGROUND

### The Pre-Ocean Loading Events At Antwerp.

The 282 coils of steel were brought into the Port of Antwerp on barges by Socantra, the manufacturer's freight forwarder, under a contract FOB Port of Antwerp.[2] Plaintiff had contracted to purchase the coils on terms—cash against documents.

---

1. In addition to the water damage alleged, plaintiff claims without opposition that two coils were lost by defendant Southern Cross Steamship Company. Thus, the total number of coils involved in this lawsuit is 282.

2. Deposition of Marcel Clement, plaintiff's Antwerp agent, dated April 20, 1977, p. 10. Clement testified that at the port of Antwerp FOB has the same significance as FAS. Cargo must be shipped "FOB and stowed" if the intent is to deliver the goods in the hold of the ship. In both FOB and FAS shipments the shipper has the obligation to bring the goods to ship's tackle.

The coils were placed in a dockside shed on October 2, 1974.[3] Upon discharge, the Antwerp stevedores noted the condition of the coils as they left the barges as follows:[4]

Lighter: "Oldenburg" discharged 10/2/74

92 coils for 665 tons.

Remarks: Packing damaged, various coils for 750 tons. Packing stained with a white powder.

Lighter: "Beppi" discharged 10/2/74

104 coils for 750 tons.

Remarks: Traces of previous handling, stained by a white powder. Some coils packing damaged.

Lighter "Andreas" discharged 10/2/74

86 coils for 662 tons.

Remarks: Stained by a white powder, traces of previous handling, various coils packing damaged.

On October 8th, Captain Mathieu, the P & I Surveyor, inspected the coils and found 43 stained with a brownish, crystalized powder.[5] He tested the stains, received a positive reaction to a silver nitrate test,[6] and took a polaroid photo of the coils.[7] He determined the condition was serious[8] and decided to take exception to all 282 coils.[9] Mathieu telephoned Captain Marselias, Socantra's agent, of his intention. Marselias was angered that he had not been informed of the condition previously.[10] In order to prevent Mathieu from clausing the mate's receipt[11] in accordance with the then present condition of the coils, Marselias said he would manage to get the coils cleaned.[12] Marselias telexed the German manufacturer on October 9th, asking for an extra man to clean the dirty deposit on the packing of the coils. Permission was granted.[13]

The date the cleaning began is not clear from the record. The coils were cleaned as they were taken out of the shed to ship's tackle[14] and the cleaning took more than one day. The coils were loaded aboard the "Margarite", which sailed on October 13th.[15]

Mathieu testified he was present during the entire time of the cleaning and then claused the mate's receipt only for those coils still having stains. The clause was:

"43 coils (with numbers) showing traces of white oxidation on outer envelopes."

Mathieu testified he sent a report to Vinke, the carrier's agent, and reported the cleaning to the master or chief mate of the vessel.[16]

Captain Spark, an expert retained by the carrier, reported on his investigation and made this observation:

"After discharge from the barges the coils were subject of a joint survey, when apparently considerable discussion arose concerning the clause under which the goods would be shipped. It was in due course agreed that the packing of a number of coils would be reconditioned before shipment under the supervision of the surveyor appointed by the local P & I correspondents...."[17]

After the coils were loaded aboard the "Margarite" and the bill of lading was claused in conformity with the mate's re-

---

3. Defendants' Exhibit 64, pp. 5–6.

4. *Id.* at 5–6.

5. Plaintiff's Exhibit 68, pp. 49–52.

6. *Id.* at 10.

7. Plaintiff's Exhibit 41.

8. Plaintiff's Exhibit 68, pp. 40–41.

9. Plaintiff's Exhibit 41A, pp. 6–8.

10. Plaintiff's Exhibit 68, pp. 7–8.

11. "Clausing" a receipt means that that inspector adds a brief statement concerning the condition of the shipment to the mate's shipping receipt or a bill of lading.

12. Plaintiff's Exhibit 68, pp. 7–9.

13. Telex 2591 attached to Defendants' Exhibit 64.

14. Plaintiff's Exhibit 68, p. 8.

15. *Id.* at 41, 65.

16. Plaintiff's Exhibit 61, p. 16; Plaintiff's Exhibit 68, pp. 7–9, 10–11, 22, 47–48, 51.

17. Defendants' Exhibit 64, p. 7.

ceipt,[18] the captain signed the bill of lading.[19] Clement, an employee of Wallco (plaintiff's forwarding agent), presented the loading permit and received the claused bill of lading signed by the master of the vessel.[20] Clement sent the original to the German manufacturer and the nonnegotiable copy to plaintiff.

Plaintiff's vice-president, Resnick, testified he received the copy of the bill of lading and that he considered the clausing —"traces of white oxidation"—to represent small or minor exceptions[21] that would not affect the condition of the steel.[22] He further testified if he had known the actual condition of the coils at Antwerp, or if he had known there was a positive silver nitrate test, he would not have accepted the shipment and would have refused to pay.[23] The witness further testified that he had rejected previous shipments which showed a positive silver nitrate reaction.[24] In reliance upon the clausing of the bill of lading, he directed his bank to make payment.

Captain Arthur Sparks of Antwerp, Belgium, a defense witness, testified that he is a marine surveyor and has been in the business for over twenty years. According to the custom of the Port of Antwerp when the cargo, before loading, is found to be damaged, a letter of indemnity is given to the master of the vessel. However, in this case, he found no evidence of such a letter of indemnity. He further testified that in accordance with the interpretation placed upon the Hague rules by cargo interests, if the master knows that the cargo condition has been altered, even if it is done in order to have a clean bill of lading, the only duty of the master, imposed by the custom of the Port, is to clause the "apparent condition"

---

18. Plaintiff's Exhibit 61–A, p. 11.

19. Defendant at trial admitted jurisdiction *in rem* but disputed plaintiff's evidence that the Captain signed the bill of lading and argued that the carrier, therefore, was not bound *in personam*. (Trans. pp. 375–377) The Court reserved judgment at that time.

After reviewing the evidence the Court finds that plaintiff did prove by a preponderance of the evidence that Captain Bonas signed the bill of lading for the instant cargo, as master. The Court relies on the following:

1. At his deposition Captain Bonas was shown Plaintiff's Exhibit 51 and identified it as a copy of the mate's receipt (Plaintiff's Exhibit 61–A, p. 7).

2. He identified Plaintiff's Exhibit 57 as a nonnegotiable copy of the bill of lading which did not bear his signature (Plaintiff's Exhibit 61–A, pp. 8, 27).

3. He identified Defendants' Exhibit 58 as the stowage plan for the coils which were loaded under bill of lading number 66 (Plaintiff's Exhibit 61–A, pp. 9, 21).

4. He testified that he signed the original bill of lading number 66 and the mate's receipts (Plaintiff's Exhibit 61–A, pp. 27–28).

5. Defendant stipulated that if a handwriting expert was called he would testify that the signature on Plaintiff's Exhibit 235 for Identification was that of Captain Bonas (Trans. p. 359).

Based upon the foregoing findings, the Court further finds that Exhibit 235 for Identification is admitted into evidence as the original bill of lading for the instant cargo.

20. Defendant, in its brief, makes reference to Exhibit 39A, pp. 23 and 41, the testimony of Clement, Wallco's employee, for the proposition that Wallco was told the coils had been cleaned. A close reading of this testimony discloses that Clement was speaking of events *after* the ship had already left port. This conclusion is borne out by testimony of Clement at pages 41–42 where he stated that he first learned that the white powder had been cleaned off the coils one or two months after the shipment. He further stated that a standardized form was used at Antwerp. All documents are in a package: the loading permit, the mate's receipt, copy of mate's receipt, copy/docks, copy/office and, on top, the bill of lading. The underlying papers are all carbons of the bill of lading with a stamp identifying the purpose of each copy, *e.g.*, mate's receipt. Wallco filled in the description of the cargo and detached the loading permit; it then gave the remaining documents to the vessel's agent. The P & I surveyor, after inspection, claused the mate's receipt. After the cargo had been loaded, Wallco gave the loading permit to the vessel and received the signed bill of lading which he forwarded to the supplier. Clement testified he had nothing to do with discharging the barges or storing the coils and that he was only interested in the shipment from the moment the ship took the coils aboard.

21. Trans. 106.

22. *Id.* at 89.

23. *Id.* at 161, 176.

24. *Id.* at 172–177.

of what he sees at the time the cargo is loaded. Captain Sparks also testified that, in the case of wrapped cargo, all stains found on the cargo should be placed upon the mate's receipt.[25] It is considered improper conduct for a vessel's surveyor to call the shipper and have the shipper remove stains on cargo.[26]

When the coils were outturned at Philadelphia they were transferred by truck to New Jersey. There they were inspected by Captain Luard, P & I representative, Mr. Silkiss, a metallurgical engineer, and Captain Farguhar representing cargo interests.

Captain Farguhar testified that in his opinion the extensive damage found was not caused during ocean carriage since the water within the coils was brackish; as was the water encountered on the barge journey from Germany to Antwerp.[27] He further testified that the polaroid photo attached to the Mathieu report,[28] showing the condition of one of the coils at Antwerp was similar to the stained condition found on the coils in New Jersey.

The American Bureau of Shipping examined the vessel shortly after discharge of the cargo and certified that she was watertight.[29]

## II.

### THE FRAUD CLAIM

Plaintiff alleges that the true condition of the cargo, known to the carrier at the Port of Antwerp, was not set forth in the bill of lading; that plaintiff relied upon defendants' misdescription and ordered payment; that upon delivery it found the cargo to be severely damaged.

25. *Id.* at 250.

26. *Id.* at 252–253. Sparks said the procedure at the Port is that the surveyor would go to the tally clerk's office to note whether or not the bill of lading was claused. The tally clerk would notify the shipper of the clause as stated on the bill of lading.

27. The testimony of Silkiss supported this observation.

28. Plaintiff's Exhibit 41.

The carrier contends that the bill of lading contains no misrepresentation and that it complied with the carriage of goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(3)(c),[30] in that it stated the apparent condition of the cargo when loaded aboard the vessel. The carrier argues that there is no rule which prevents a shipper from cleaning cargo before tendering it to the carrier, and that the custom of the port was that the vessel should only clause for apparent condition at ship's tackle. In addition it claims that plaintiff's agent Wallco had been told of the cleaning and that Wallco's knowledge is imputed to plaintiff, citing *Caterpillar Overseas v. SS. Havtroll.*[31] Carrier's final argument is that the charterer issued the bill of lading and if it contained a misrepresentation it is binding on the charterer, not defendant carrier.

### A. *Imputed Knowledge*

■ The analysis must begin with a finding as to the knowledge of Wallco, plaintiff's agent at Antwerp. If Wallco knew the coils had been cleaned and that the bill of lading did not represent the actual cargo condition, AMI is charged in law with the knowledge of its agent and cannot prove good faith reliance upon the clausing of the bill of lading.

■ The cargo was shipped to the Port of Antwerp FOB from the German manufacturer to the account of plaintiff.[32] According to the custom of the Port, transfer of title, custody and control takes place at ship's tackle. There is no evidence in this record that Wallco was either a participant in the cleaning or had knowledge that the

29. Plaintiff's Exhibits 61A pp. 18–19; Defendants' Exhibits 186–187; Trans. pp. 183–187, 224–225.

30. "After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing ... (c) The apparent order and condition of the goods..." 46 U.S.C. § 1303(3)(c).

31. 1972 A.M.C. 241 (S.D.N.Y.1972).

32. Plaintiff's Exhibit 39A, pp. 20–22.

coils were cleaned until *after* the bill of lading was issued.[33] The bill of lading was not issued until *after* the cargo had been stowed aboard the "Margarite". At the time the coils were cleaned, title and possession were in the German shipper. The only participants in the cleaning were the German shipper's agent, Masilias, and the P & I Surveyor, Mathieu. Clement, Wallco's agent, testified that he prepared the loading permit which entitles the stevedores to take the cargo from the quay and load it on the carrier.[34] He copied the clausing from the mate's receipt which was filled out after the cleaning. The record is barren as to any knowledge by him, at that time, that the coils had already been cleaned. The Court, therefore, finds that Wallco had no knowledge of the cleaning prior to loading on the vessel and thus no knowledge of the cleaning can be imputed to plaintiff.

### B. *Custom of the Port*

The contention of the carrier, that the bills of lading did not contain a misrepresentation of the condition of the cargo, is based upon the alleged custom of the Port of Antwerp. Captain Sparks testified that the custom of the Port was to clause only for apparent condition of the goods—even if the master has knowledge that the cleaning of the cargo was for purposes of an unclaused bill of lading. This testimony is qualified in that Captain Sparks considered it improper for the vessel surveyor to call the shipper and have the shipper remove stains from the cargo.

Mr. Clement, Wallco's agent, testified that the custom of the Port is to clause for apparent condition. However, that testimony must be read in connection with the following dialogue:

Q. The point is that even though the man who issues the bill of lading and says on this particular day it is in apparent good order, even though he knows on the previous day it had been rained on, as long as the piece of cargo appears to be

dry, he can give a clean bill of lading? Do you know that to be true at Antwerp?
A. No, I think that is a question for one's own conscience to solve.

\* \* \* \* \* \*

Q. No, I am asking you if you know that that is a practice in the Port of Antwerp?
A. No. I would not call that a practice.
Q. Do you know of it being done in the Port of Antwerp?
A. I do not know what all my colleagues do, of course, but I would not consider that to be any kind of practice or anything that you can stand by even.[35]

Even if this Court were to find that the cleaning of the coils by Socantra, with the knowledge and active participation of the P & I Agent, Mathieu, was in fact in accordance with the custom of the Port of Antwerp, such finding would not create a defense for vessel interests. *Tug Ocean Prince Inc. v. United States of America,* 584 F.2d 1151 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979) this Circuit held as follows:

The rule which has been supported generally by most of the authorities is that conformity to custom is not in itself the exercise of due care. Custom and usage do not justify negligence. A party cannot by his own continued negligence establish a custom by which he is exempt from liability; nor is legal responsibility for negligence mitigated by the fact that others had also been negligent. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact. (citations omitted.)

*Id.* at 1156. This holding is even more appropriately applied to claims of intentional rather than negligent conduct.

### C. *Estoppel*

*Higgins v. Anglo-Algerian S.S. Co.,* 248 F. 386 (2d Cir.1918) was a libel for cases of dates shipped under a clean bill of lading

---

**33.** *Id.* at pp. 23, 41–42.

**34.** Plaintiff's Exhibit 56.

**35.** Plaintiff's Exhibit 39A, pp. 34–35.

"apparently in good order and condition". At outturn the cases were severely water damaged. The answer set up a defense characterized by the Court as follows:

"Further, the respondent had the courage to set up as a defense its own complicity in a fraud, viz., that a large number of the cases which had been wet and were stained and discolored by rain were received from lighters; that their stained, damaged, and discolored condition had been noted on the mate's receipts, but that a clean bill of lading was delivered to the shippers at their request ..."

*Id.* at 387. The Court held that, while a bill of lading is only a quasi-negotiable instrument, the carrier could have set up a defense against the shipper but he could not do so as against the subsequent holder who was intended to be misled. The Court further held that although courts sitting in admiralty could not give affirmative equitable relief, *i.e.* rescission for fraud in the inducement of a contract, "still they do proceed upon equitable principles and may prevent a party from taking advantage of his own fraud in the contract itself." *Id.* at 389. The court held the carrier was estopped to deny the clausing of the bill of lading.

Judge Augustus Hand, in speaking for the Second Circuit in *Switzerland General Ins. Co. v. Navigazione Libera T.,* 91 F.2d 960 (2d Cir.1937) commented upon the application of this principal:

"In *The Carso,* we held that the owner of the vessel ... was estopped to invoke exceptions in bills of lading relieving it from claims for damage from putrefac-

tion of the cheese, where it had been described as shipped in 'apparent good order and condition,' but where, at the time of shipment, the cases showed on their exterior that it was infested with worms and had begun to decay."

*Id.* at 961. In *The Carso,*[36] Judge A. Hand discussed the doctrine of estoppel as applied to false bill of lading cases. The principles stated therein, as applied to the instant case, are as follows:

(1) Where the cargo is in fact damaged (162 cases of cheese) but there is no proof that the damaged condition was known to the carrier, the carrier is not liable for the loss where the bill of lading recites that the cargo was received in "apparent good order and condition".

(2) Where the packaging is broken (420 cases of cheese), but there is no proof that the carrier knew of any damage to the contents, the mate's receipt is claused "broken—not answerable for contents", and a clean bill of lading issued, the carrier is estopped to show that the cases were not broken. However, the carrier is not estopped to show that the damage was caused for reasons independent of the breakage.

(3) Where the mate's receipt is claused "cases stained by the contents" (467 cases of cheese) and the carrier, after securing agreements of indemnity from the shipper, issues clean bills of lading, the carrier will be estopped to show the cargo was not in actual good order and condition.[37]

---

**36.** *The Carso,* 53 F.2d 374 (2d Cir.1931), *cert. denied,* 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574 (1931).

**37.** The Court explained:

This is so because the particular defect which the consignees complain of was apparent to the ship by reason of the exudations at the time the clean bills of lading were issued. This decay was progressive, and the damage discovered when the cheese was unloaded was due to it. As soon as the consignee proved that the decay from which the damage ultimately resulted was apparent, he made out his case, for the ship had recited in the bill of lading that it was not apparent and the consignee had a right to rely on this statement as conclusive proof that there was not apparent defect. The consignee could further prove as a fact that there was no decay of which there were not apparent signs. These two elements of proof can be taken together to show that the cheese started out in good condition. The consignee has by the recital in the bill of lading proved that the cheese was in good order and condition though strangely enough he has had to do this by first showing that the ship knew it was not so in fact and notwithstanding issued a clean bill of lading.

(4) The fact that some of the packings showed staining, indicative of the condition of the contents, cannot be taken as evidence that other cargo—without apparent evidence of interior damage—was likewise in a damaged condition.

## D. Conclusions of Fact and Law

1. The defendant carrier admits liability for the two coils which were not delivered at outturn.

2. The presence of white rust on the 43 coils at Antwerp was indicative of prior contact with salt water which causes progressive deterioration of the steel coils.

3. Captain Mathieu, the P & I surveyor, participated in and condoned the act of the manufacturer in removing oxidation from the 43 coils so that a bill of lading claused for the 43 coils as showing only traces of oxidation could be issued to the supplier.[38]

4. Captain Mathieu is charged with knowledge that wetting causes rusting and damage to steel coils over a period of time. He also knew that the bill of lading prepared and claused with his knowledge and consent, and in concert with the manufacturer's agent, would be placed in the stream of commerce. It was entirely forseeable to him that some holder, without knowledge, would be damaged. The clausing of the bill of lading, so as to misrepresent the actual condition of the 43 coils, constituted a

fraudulent representation for which the vessel and her owner are liable.[39]

5. The custom of the Port of Antwerp is no defense to a claim of fraud where, as here, the carrier's agent participated in the fraudulent act.

6. Plaintiff did not have notice of the actual condition of the coils at Antwerp.

7. Defendant is estopped from proving the actual condition of the 43 coils.

8. The description on the bill of lading of the extensive white rust found at Antwerp on 43 coils as "traces" was a material misrepresentation.

9. Plaintiff relied upon the description in the bills of lading in ordering payment for and accepting the shipment.

10. Plaintiff has proven by a preponderance of the evidence its fraud claim as to the subject 43 coils.

11. The Master, Captain Bonas, signed the bill of lading, Exhibit 235, as "The Master." [40]

12. By express contract, Southern Cross Steamship Co., Inc. assumed liability for breach of the contract of carriage and, under definition of the term "merchant", designated an entity such as this plaintiff as a party having standing to enforce that liability.[41]

13. Defendant Southern Cross Steamship Co., Inc. is liable to this plaintiff *in personam* and *in rem.*

Id. at 377.

**38.** Plaintiff's Exhibit 68 pp. 5, 7–9, 40–41, 48; Plaintiff's Exhibit 39A, p. 23; Plaintiff's Exhibit 41–A, pp. 11–18; Defendants' Exhibit 197.

**39.** *See, e.g., Empresa Central Mer. De R. v. Republic of U.S. of Brazil,* 257 F.2d 747 (2d Cir.1958) involving the shipment of steel sheets. The carrier issued dock receipts stating wrappers torn, sheets badly rusted. Through what the court called connivance with the shipper, the carrier issued a clean bill of lading—apparent good order and condition. The carrier conceded it had committed a fraud in issuing the bill of lading, and the court found it necessary only to discuss the measure of damages. *Accord, Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009 (2d Cir.1972) (the court reached a similar conclusion where the carrier issued a clean bill of lading despite its

knowledge at the time that the steel coils were rusted).

**40.** *See* note 19 *supra.*

**41.** The Paramount Clause on the reverse side of Plaintiff's Exhibit 235 reads as follows:

Whenever the term "merchant" is used in this Bill of Lading, it shall be deemed to include the Shipper, the Receiver, the Consignee, the Holder of the Bill of Lading and the owner of the cargo. The contract evidenced by this Bill of Lading is between the merchant and the owner of the vessel named herein (or substitute) and it is therefore agreed that said shipowner only shall be liable for any damage or loss due to any breach or non-performance of any obligation arising out of a contract of carriage, whether or not relating to the vessel's seaworthiness.

**214**

## III.

### THE NEGLIGENT CARRIAGE CLAIM AS TO 237 COILS

■ Plaintiff has the burden of proving that the goods were damaged while in the carrier's custody. This burden can be met by proof of good condition upon delivery to the carrier and damage at outturn. In this case all of the credible evidence showed that the remaining 237 coils had bright, shiny waster sheets when loaded aboard at Antwerp. Plaintiff sues to recover, not for damage to the wrappings, but for the damaged coils contained therein. Captain Bonas testified that when the 237 coils were loaded at Antwerp, they had no traces of oxidation.[42]

Our Court of Appeals in *Caemint Food, Inc. v. Lloyd Brasileiro,* 647 F.2d 347 (2d Cir.1981) held:

> Although a clean bill of lading normally constitutes *prima facie* evidence that cargo was in good condition at the time of shipment, courts have long recognized that it does not have this probative force where, as here, the shipper to recover for damage to goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded.

Quoting from *The Niel Maersk,* 91 F.2d 932 (2nd Cir.), *cert. denied,* 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937), the Court reaffirmed its view that:

> Recitals of "apparent good order and condition" in the bills of lading furnished only prima facie proof of the external condition of the bags. But their external condition would not show whether the contents were potentially subject to . . . deteriorate owing to excess of moisture

> . . . The shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment . . . .

*Id.,* at 352.

The *Caemint* Court further held that when the internal condition is not adequately revealed by external appearances plaintiff must sustain his burden of proving the actual condition by producing credible evidence that the contents of the packages were in fact in good condition when loaded.

■ The Margarite arrived in Philadelphia on October 28, 1974. Captain Quistgaard, Marine Surveyor for owner interests, conducted a survey and submitted his report. Captain Quistgaard inspected holds 3, 4, 5 & 6 which contained the subject coils. He found white oxidation on the envelopes of some coils which tested positive, other coils were negative. There was no evidence that water had entered at the holds nor were there any definite patterns of rust streaks across the cargo below the hatch cover seams. The surveyor examined the mate's receipts and loading survey report.[43] In his opinion no water entered the cargo holds during the voyage. He believed the cargo was wetted by rain before shipment.

The coils were received at outturn by a trucking company which noted[44] that they were received in rain, without tarpaulins, some had rusty covers and a large number, more than 43, showed white rust. Upon arrival at destination in New Jersey,[45] the coils had water running out of the wrappers.[46] Some of the wrappers were opened and water was inside the galvanized coils.[47]

The coils were tested and inspected in Jersey City by Captain Farquhar, representing cargo underwriters, who found

---

**42.** Plaintiff's Exhibit 61A p. 62.

**43.** The loading survey report stated that loading operations at Antwerp took place during heavy rain showers. Another survey was conducted November 14, 1974 (Defendants' Exhibit 59) which disclosed that the hatch covers were hose tested and found tight. American Bureau of Shipping survey records dated November 1973—December 1974 (Defendants' Exhibits 183–187) and cargo's survey (Plain-

tiff's Exhibits 224–225) showed the vessel in satisfactory condition.

**44.** Ex. 77.

**45.** Deposition of Mr. Herman, dated June 24, 1977, p. 32.

**46.** *Id.* at 10.

**47.** *Id.* at 11.

there was heavy patchy oxidation and in some instances pronounced streaking on the wrappers.[48] Captain Farquhar testified that he and Captain Luard examined the interior of sample coils, that he observed water inside the coils, tested it with silver nitrate and in each instance the test was negative showing no chloride reaction.[49] Mr. Silkiss, a metalurgical engineer, testified that he examined the coils in Jersey City on November 12, that he took scrapings of four samples and performed a qualitative analysis for chlorides which was positive. He stated that he performed a further test for sodium, magnesium and calcium ions to establish the ratio of these elements to chlorine and to compare these ratios from the samples with the ratio as it normally occurs in sea water. As a result of his testing Mr. Silkiss opined that there was insufficient correlation to say that the wetting was caused by sea water, that the presence of chlorides eliminated fresh water as the cause, and that in his opinion the rust was caused by river water contaminated with sea water, as might occur in a harbor. He testified that he could say with a reasonable degree of chemical certainty that the wetting was caused by brackish water.[50]

This Court makes the following conclusions of fact:

1. The testimony of Captain Sparks, whose home port is Antwerp, that the water in Antwerp harbor is brackish, was credible.[51]
2. Based on the notation on shipping documents, the Antwerp stevedores, upon unloading the coils from the manufacturer's barges, found traces of white powder.[52]
3. On the basis of the chemical analysis and expert opinion of Mr. Silkiss, the metallurgical engineer, the coils were wetted by brackish water.[53]

4. American Bureau of Shipping certified that the vessel was watertight.[54]
5. The 237 coils were wetted before they were loaded aboard the Margarite.
6. Because of progressive deterioration, the damage evidenced on inspection in New Jersey was attributable to the pre-ocean voyage condition.
7. Plaintiff has not proven by a preponderance of the credible evidence that the 237 coils were damaged while in the carrier's custody.[55]

## IV.

## CONCLUSION

After trial this Court finds plaintiff has proven its fraud claim by a preponderance of the credible evidence and plaintiff is awarded a verdict for 43 coils against the defendants M.V. Margarite and Southern Cross Steamship Co., Inc. *in personam* and *in rem.*

Plaintiff is also awarded a verdict for the 2 coils defendants conceded were short at outturn.

Since plaintiff has failed to prove by a preponderance of the credible evidence defendant's liability for damage to 237 coils, the Court enters a verdict as to these coils in favor of defendant.

This Court will schedule a hearing within thirty days of the entry of this Order to assess damages for 45 coils.

It Is So Ordered.

---

48. Trans. p. 333.

49. Trans. p. 323.

50. Trans. pp. 392–396.

51. Trans. p. 274.

52. Defendants' Exhibit 64.

53. Trans. pp. 392–396.

54. Plaintiff's Exhibits 61A; Defendants' Exhibits 183–187; Trans. pp. 183–187, 224–225.

55. On the facts in this case this is the burden plaintiff must assume under the relevant provision of COGSA, 46 U.S.C. § 1303. *Caemint Food Inc. v. Lloyd Brasileiro, Companhia De Navegacao,* 647 F.2d at 356.