Leonard MEYERSON and William Gross, as Chairman and Co-Chairman, respectively, and Trustees of the Joint Plumb-ing Industry Board and Funds Administered by the Joint Plumbing Industry Board, Plaintiffs,

and

John Daly, Peter Salzarulo, Strat Scarlatos and Michael Eustace, individually, and as Officers and Members of Local Union No. 2, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plaintiffs-Intervenors,

v.

The CONTRACTING PLUMBERS ASSOCIATION OF BROOKLYN & QUEENS, INC., Defendant.

v.

Leonard MEYERSON, Lawrence Felder, William Greenblatt, and Herbert Greenberg, individually, and as Trustees of the Joint Plumbing Industry Board of the City of New York and all Trust Funds Administered by the Joint Plumbing Industry Board of the City of New York, and the Association of Contracting Plumbers of the City of New York, Inc., Additional Defendants on Counterclaims.

LOCAL UNION # 2, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, Plaintiff,

v.

The CONTRACTING PLUMBERS ASSOCIATION OF BROOKLYN & QUEENS, INC., Alumni Plumbing & Heating Corp., Jodinan Plumbing & Heating Corp., and Richard Plumbing & Heating Corp., Defendants.

Nos. 84 Civ. 7009 (RWS), 84 Civ. 7239 (RWS).

United States District Court, S.D. New York.

March 21, 1985.

Kennedy & Casey, P.C., Garden City, N.Y. (Stanley Q. Casey, Garden City, N.Y., of counsel), for plaintiffs-intervenors.

Kaming & Kaming, New York City (Joseph S. Kaming, Elizabeth C. Kaming, New York City, of counsel), for plaintiff Joint Plumbing Industry Bd.

Cooperman, Levitt & Winikoff, P.C., New York City (William M. O'Connor, New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

The parties in this consolidated action, before the court on crossing motions for summary judgment and motions to dismiss, seek to determine the status of various contractual obligations between differing plumbing contractor organizations and Local # 2. The dispute in its present form centers on the validity of the collective bargaining agreement between the "Brooklyn Association" and Local # 2. I conclude that this contract is void.

### Prior Proceedings and Parties

Plaintiffs, Joint Plumbing Industry Board[1] ("PIB") and Local Union # 2 United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada ("Local # 2") and its officers, moved for summary judgment pursuant to Fed.R. Civ.P. 56 against defendant, The Contracting Plumbers Association of Brooklyn & Queens, Inc., (the "Brooklyn Association").

Local # 2 is the plumbers local union with jurisdiction in Manhattan and the Bronx. The Joint Plumbing Industry Board is a collection agent for plumbing industry funds and day-to-day administrator of certain Local # 2 trusts pursuant to 29 U.S.C. § 186. The Association of Contracting Plumbers of the City of New York, Inc. (the "New York Association") is a plumbing contractor trade association and has been the management collective bargaining agent with Local # 2 for the Local

# 2 jurisdiction, Manhattan and the Bronx. The Brooklyn Association is a plumbing contractor trade association and has been the management bargaining agent with plumbers Local # 1, which has jurisdiction in Brooklyn and Queens. Local # 1 is not a party to this action.

PIB and Local # 2 seek a declaration that there is no collective bargaining agreement between Local # 2 and the Brooklyn Association and that the purported agreement of January 11, 1984 between Local # 2 and the Brooklyn Association is null and void and the dissolution of a temporary stay, issued by the Honorable Eugene Nickerson in *Local Union # 2 v. The Contracting Plumbers Association of Brooklyn & Queens, Inc., and Alumni Plumbing and Heating Corp., Jodinan Plumbing & Heating Corp., and Richard Plumbing & Heating Corp.*, 84 Civ. 7239 (RWS), as follows:

IT IS HEREBY ORDERED:

a) All arbitration proceedings commenced, or to be commenced, by the plaintiff against the defendants, or against any member of the defendant, The Contracting Plumbers Association of Brooklyn & Queens, Inc. (the "Brooklyn Association"), based upon alleged violations of the New York Agreement, including the noticed arbitration procedure against Saf-Tee Plumbing Corp. are stayed; until further order of this court; and ...

Order of Judge Nickerson in *Local # 2 v. Brooklyn Association*, 84 Civ. 7239 (RWS), Cv–84–3848 (EHN). This action was by the consent of all concerned transferred to this court and consolidated with the action pending here.

The defendants have sought a declaration by summary judgment that the Brooklyn Agreement is valid and the dismissal of PIB. In its answer, the Brooklyn Association also brought counterclaims against certain trustees of the PIB and the New

---

1. The Plumbing Industry Board has standing in this action. *See Nedd v. United Mine Workers*, 556 F.2d 190, 197 (3d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978); *Livolsi v. City of New Castle*, 501 F.Supp. 1146 (W.D.Pa.1980).

York Association. By stipulation, the Brooklyn Association has agreed to extend the time to answer the counterclaims until twenty days after resolution of the motions currently before the court. All parties recognize that the dispositive issue is the validity of the alleged Brooklyn Association—Local #2 agreement.

**Facts**

Facts sufficient to resolve these motions are undisputed. The New York Association and Local #2 are bound by a sixty-one page collective bargaining agreement, effective June 30, 1982 to June 25, 1985, which details all aspects of the relationship between the parties. Among the terms of this contract were:

105. NO OTHER CONTRACTS TO BE MADE: No contracts or understandings inconsistent with or contrary to the terms of this Agreement shall be made between the Association and the Union either as individuals or groups.

106. NO OTHER AGREEMENTS EXIST: No other understandings or agreements exist between the parties hereto or their members, and this agreement contains the complete understanding between and among them. All prior agreements and understandings, oral or written, shall terminate upon the taking effect of and shall be superseded by this Agreement. No amendments or modifications of this Agreement shall be valid unless it is agreed to by the Association and the Union and reduced to writing.

The Brooklyn Association contends that Local #2 entered into a Brooklyn Association—Local #2 collective bargaining agreement on January 11, 1984. This agreement states in totality:

1. All of the terms and conditions of the collective bargaining agreement between the Union and the Association of Contracting Plumbers of the City of New York, Inc. ("New York Association") (the "Local 2 Agreement") are hereby agreed to and adopted subject to the following provisions.

2. References in the Local 2 Agreement to the "Association" shall mean the Association defined in this Agreement (i.e. the Contracting Plumbers Association of Brooklyn and Queens, Inc.). Any dispute between the Union and a member of the Association shall be resolved in the same manner as provided for in the Local 2 Agreement except that the management (or employer) representatives of the various joint arbitration, executive committees, etc. shall be designated by the Association.

3. Reference in the Local 2 Agreement to the Plumbing Industry Promotion Fund of Manhattan and Bronx shall be changed to read the "Metro New York Plumbing Industry Promotion and Education Fund" or other similar fund created by the Association.

4. The Union agrees that it has no objection for the Association to arrange to designate such number of the management trustees of the Joint Plumbing Industry Board ("JPIB") approximately proportional to the number of man-hour contributions of the members of the Association to the JPIB.

5. This agreement shall be effective immediately and shall remain in effect for the duration of the Local 2 Agreement.

This agreement was signed by William Gross ("Gross"), president of Local #2; Fred Brenner, President of the Brooklyn Association, President of Saf-Tee Plumbing, and a member of the New York Association from September, 1982 to September 1984; George Whalen, the Managing Officer of the Brooklyn Association; James Whalen, a member of the Executive Board of the Brooklyn Association, and President of Alumni Plumbing & Heating Corp., who was bound by the New York Association—Local #2 agreement (PIB 19-21; O'Donnell Aff. Exhibit D; J. Whalen dep. at 7-11); and Salvatore Gamba, a member of the Executive Board of the Brooklyn Association and President of Olympic Plumbing and Heating Corp., who admits to being bound by the New York—Local #2 agreement (Gamba dep. at 31).

The Brooklyn—Local # 2 agreement was negotiated at two meetings, held on January 5 and 11, 1984. The only representatives of the union with knowledge of the negotiation were Gross and Brian O'Dwyer ("O'Dwyer"), an attorney for Local # 2. No union meeting was called immediately subsequent to the signing of the agreement in order to notify the union of the agreement and to vote on ratification of the agreement, and on March 14, 1984, the agreement was voted down by the Local # 2 membership. On January 1, 1985, Gross was replaced as president by Peter Salzarulo ("Salzarulo").

The Local # 2 constitution defines the powers and responsibilities of the president and the Arbitration Board as follows:

### Section 14. President.

(A) The duties of the President shall be to preside over the Local Union's interests, affairs and all officers, see that the Constitution, By-Laws and Rules of Order, are observed, decide all questions of order, subject to any appeal to the Local.

.　　.　　.　　.　　.

### Section 24. Arbitration Board

(A) The Arbitration Board shall negotiate all trade agreements and sit as a judicial body with representatives of our employers in the hearings of cases in violation of such agreements.

(B) In negotiations of a new agreement between the Master Plumbers and the Local Union they shall make a full and complete report at the membership meeting after every Arbitration Board meeting pending approval of the minutes of their meetings.

Further, the By-Laws of Local # 2 state that:

(F) All voting on the ratification or changes of our collective bargaining agreement must be made by voting machine. There must be a special meeting held for such voting on a regular meeting night, and all members must be notified by mail. All members eligible to vote must have their dues books stamped before voting. The chairman must appoint tellers to supervise and count the votes. Half of the tellers appointed must be for the proposition and the other half against.

Salzarulo, now president of Local # 2, asserts that:

9. The By-Laws and Constitution of Local 2 provide that all negotiations by representatives of Local 2 with respect to collective bargaining agreements between Local 2 and employers or their collective bargaining representatives, must be conducted by an Arbitration Board (See Sect. 24, By-Laws of Local 2 attached hereto as Exhibit "2"). As long as I have been a member of Local 2, the correct procedure has always been that Local 2, acting through its Arbitration Board, negotiates the "Master Agreement" with the New York Association. Although the Arbitration Board may appoint one spokesperson to convey Local 2's demands and responses to the employers' association, all negotiations are conducted by Local 2 with the consent and presence of the Local 2 Arbitration Board. Further, no officer of Local 2, including the President, is authorized to engage in negotiations with any employer association regarding a new collective bargaining agreement or *any* changes in the existing Master Agreement without the consent and presence of the Arbitration Board.

10. The By-Laws and Constitution of Local 2 also provide that after the Arbitration Board has arrived at a tentative "understanding" with the Employers Association regarding a new contract or *any* modifications or changes in the existing Master Agreement, the membership must be afforded an opportunity to review and affirmatively ratify the new agreement or any change in the existing master agreement. (Salzarulo aff.)

The Brooklyn Association asserts, nonetheless, that at the January 5 meeting, the Brooklyn Association's attorney asked the Union's attorney "Does Willy Gross have proper authority to negotiate and sign a collective bargaining agreement on behalf

of the Union?" and that O'Dwyer replied "Yes," stating that under the Union's constitution and by-laws, Gross had the authority as President to sign the contract. The Brooklyn Association also asserts that Gross asked O'Dwyer whether any other signatures or procedures had to be completed in order to effectuate the agreement and that O'Dwyer repeated that no further action was required.

Gross, however, denies that the Brooklyn Association—Local # 2 document is a binding agreement or collective bargaining agreement:

Q. Is this document an agreement?

A. No. I have papers before a judge saying it isn't.

Q. Is this document a collective bargaining agreement?

A. No.

Gross Tr. 75; *see* similar statements Gross Tr. 19, 55, 56, 73.

And O'Dwyer similarly claims that Gross' signature did not create a legally binding contract:

Q. In other words, then what you represented is that Mr. Gross could sign a paper called an agreement, but that wouldn't make that a legally binding document as far as the union was concerned; is that right?

A. As you are aware, Mr. Kaming, and we are, in labor relations, it is customary for a President or Chief Executive Officer to sign a piece of paper and then submit it to his membership for ratification.

Q. When you answered that question, was that the import of your answer, from the point of your giving information at that meeting?

A. That's the information I gave. I was with sophisticated legal counsel on the other side.

O'Dwyer at 22.

## Conclusions

Determination of the legal effect of the Brooklyn Association—Local 2 agreement focuses on two distinct issues: the necessity that any collective bargaining agreement be ratified by the Local # 2 membership, and the authority, or apparent authority, of Gross to negotiate a collective bargaining agreement within the Brooklyn Association.

## Ratification

■ A collective bargaining agreement must be ratified by a union's membership only if the union's constitution, by-laws or rules and regulations create such a requirement. There is no independent requirement in federal law of ratification by a union. *Deboles v. Transworld Airlines, Inc.,* 552 F.2d 1005, 1018 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977) ("[F]ederal law does require a ratification vote if the union constitution or by-laws require it."); *Texaco, Inc. v. N.L.R.B.,* 722 F.2d 1226 (5th Cir.1984); *United Broth. of Carpenters v. Albany,* 553 F.Supp. 55 (N.D.N.Y.1982).

■ In determining whether the constitution or by-laws of a union mandate ratification, a court must pay great deference to a union's interpretation of its own governing documents, and a reasonable interpretation of those documents will ordinarily be upheld. *Newman v. Local 1101,* 570 F.2d 439 (2d Cir.1978); *Gurton v. Arons,* 339 F.2d 371 (2d Cir.1964); *United Broth. of Carpenters, supra; Lenfest v. Boston & Maine Corp.,* 537 F.Supp. 324 (D.Mass. 1982).

The current president of Local # 2, Peter Salzarulo, in his affidavit, *supra,* stated that the constitution and by-laws require ratification of new agreements. Gross also contends that any alteration of existing contracts are not binding until ratified by the union:

Q. With respect to the collective bargaining agreement in existence between Local 2 and the Manhattan contractors, is it a fact that the bylaws require that any changes to this collective bargaining agreement would require ratification by the membership of Local 2?

A. I imagine they would have to. In a general sense, yes.

Gross, 11/2/84, p. 44.

Q. That means if this contract is changed, the itsy-bitsy bit—that's is—

288

itsy-bitsy, tiniest bit, that it would require ratification by the membership?
A. If it was going to be changed in writing, yes.

Gross, 11/2/84, p. 45.

And Brian O'Dwyer, the former attorney for Local # 2, also testified, *supra* that Gross' signature on the Brooklyn Association—Local # 2 agreement did not signify that the agreement was a binding contract, but only that he would present that document to the membership for a ratification vote.

■ This interpretation of the constitution and by-laws of Local # 2 is reasonable. Although By-law 31(F), *supra,* could be interpreted as setting forth procedures which must be followed only after a decision had been made to seek ratification of a particular contract, the more reasoned interpretation of the mandatory language in 31(F) is that expressed by the current and former presidents of Local # 2, as well as by counsel for the union. Moreover, if ratification were necessary only for certain contracts, the constitution's and by-law's silence on the issue of which contracts required ratification would be surprising, in view of the specific procedures defined for ratification. Because the union's own interpretation is reasonable, and the court's jurisdiction to intervene in interposing an alternative interpretation is limited, *Navarro v. Gannon,* 385 F.2d 512, 516 n. 6 (2d Cir.1967), *cert. denied,* 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968); *United Brotherhood of Carpenters, supra,* I conclude that the union's interpretation of the ratification requirement is proper.

■ Representatives of the Brooklyn Association were aware of the ratification requirement and thus could not justifiably rely upon an apparent assertion that Gross' signature created a binding contract. James Whalen, a Brooklyn Association executive member, and one of the negotiators of the agreement, testified:

Q. So, in other words, it is your understanding that, according to the bylaws and constitution of the United Association, that an agreement would require ratification by the membership, is that right?
A. yes.
(J. Whalen 48)
Q. Regarding changes, is it your understanding the delegates do not have the authority to change the agreement?
A. I would assume so.
(J. Whalen 66).

Salvatore Gamba, a member of the Brooklyn Association executive committee and a signator of the agreement, testified:

Q. Am I correct in saying, Mr. Gamba, a standard operating procedure when a new agreement is entered into, it would be ratified by the membership of the local?
A. Yes.
Q. Is that based upon your years of experience as a member of the UA, United Association Local 1, and also as a contracting employer plumber?
A. Yes.
(S. Gamba 17)

Lawrence Felder, Chairman of the New York Association negotiating committee for the 1982–85 New York Association—Local # 2 agreement, testified as follows with respect to the knowledge of Richard Farrell, the President of the Brooklyn Association until January 10, 1984 and a member of the New York Association negotiating committee for the 1982–85 agreement:

A. I think I answered that in a previous question when I told you, counselor, at every single negotiating committee meeting I made an opening statement that nothing, even though we agreed upon a paragraph, it is not agreed upon until it is ratified by both labor and management.
Q. Would you have an opinion with regard to whether or not Mr. Farrell knew that any new collective bargaining agreement would need ratification?
A. Counselor, Richard Farrell is a very intelligent person and sitting in every single meeting practically and I have to assume he was totally aware of the fact it had to be ratified.

(Felder at 102–03).

And Fred Brenner, who became president of the Brooklyn Association on January 10, 1984 and who signed the Brooklyn Association—Local # 2 agreement, testified that:

Q. Mr. Brenner, you testified previously today that it was your understanding that agreements were generally ratified in the industry, is that not correct?

A. I did not say that. I said agreements pertaining to the changes insofar as wages, benefits, and working conditions would require ratification.

(Brenner at 63).

The knowledge of these Brooklyn Association officers and Executive Board members can, as a matter of law, be imputed to the Brooklyn Association. *Phelan v. Middle States Oil Corp.,* 210 F.2d 360, 365–6 (2d Cir.1954); *American Industries Corp. v. M.V. MARGARITE,* 556 F.Supp. 206 (S.D. N.Y.1981); *In Re Investors Funding Corp.,* 523 F.Supp. 533 (S.D.N.Y.1980); *Restatement of Agency* (Second) § 272.

■ The Brooklyn Association—Local # 2 agreement was a new contract which made changes relating to matters of wages, benefits, and working conditions, and therefore required ratification before it became effective. Although the Brooklyn Association has attempted to assert that the contract does not affect wages, benefits, or working conditions, the new agreement does so in several respects: 1) by substituting a new party as the representative of the contracting employers; 2) by substituting a new authority for creation and management of the apprenticeship program; and 3) by creating a different body with jurisdiction over grievance and arbitration procedures. These are changes affecting wages, hours, and working conditions, and are thus matters which even the representatives of the Brooklyn Association recognized required membership ratification. In the absence of such ratification the agreement cannot be enforced against the union.

### Gross' Authority to Negotiate

■ A union can limit the authority of its officers to negotiate collective bargaining agreements. *Houchens Market v. NLRB,* 375 F.2d 208 (6th Cir.1967). Section 24 of Local # 2's constitution, *supra,* vested authority to negotiate trade agreements in an Arbitration Board. Salzarulo in his affidavit stated that the Arbitration Board has always conducted negotiations, and no individual officer was authorized to engage in negotiations with an employer association without the consent or presence of the Arbitration board. It is uncontested that only Gross and O'Dwyer were aware that negotiations with the Brooklyn Association were occurring, and Gross had not obtained the consent of the Arbitration Board for the specific terms of the agreement he signed or the holding of negotiations with the Brooklyn Association at all. Gross was without actual authority to conduct the negotiations or to bind Local # 2.

■ Gross also lacked apparent authority to negotiate the agreement. Under common law agency principles, controlling here, *Carbon Fuel Co. v. Mine Workers,* 444 U.S. 212, 216–17, 100 S.Ct. 410, 413–14, 62 L.Ed.2d 394 (1979), the union is not bound by Gross' signing the contract. The apparent authority of an agent is created only by manifestations of such authority by the principal. "Professor Mechem stated many years ago that '[t]he authority of an agent, and its nature and extent ... can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself agent only by saying that he is one.' 1 Mechem, Agency § 285, at 205 (1914 ed.)" *Karavos Compania v. Atlantica Export Corp.,* 588 F.2d 1, 10 (2d Cir.1978); *N.L.R.B. v. Donkin's Inn, Inc.,* 532 F.2d 138 (9th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976). No actions on the part of the principal, Local # 2, are alleged to support the impression of apparent authority. Moreover, representatives of the Brooklyn Association have testified that they knew the president alone was not authorized to negotiate a collective bargaining agreement. *See* Pretrial examination

of G. Whalen at 66–69; Pretrial Examination of J. Whalen at 76. The Brooklyn Association could not have relied reasonably upon any authority claimed by Gross, in view of the Brooklyn Association's knowledge of Local # 2's actual distribution of authority.

▮ In the absence of any authority by which Gross could bind Local # 2, the Brooklyn Association cannot enforce the alleged agreement against Local # 2.

**Pending Arbitration**

▮ Arbitration based upon alleged violations of the New York agreement by members of the Brooklyn Association who were also party to the New York—Local # 2 agreement were stayed by Judge Nickerson. Since I have found that the Brooklyn Agreement is void, no reason to stay the arbitration will exist if the parties to the arbitration are subject to the terms of the New York agreement. James Whalen, President of Alumni Plumbing and Salvatore Gamba, President of Olympic Plumbing, conceded in their depositions that they were still bound by the New York Agreement. (J. Whalen at 17, 32; Gamba at 27–31).

Saf-Tee Plumbing was a member of the New York Association. (*See* PIB Exhibit 1B and 1D). This agreement is effective until June 25, 1985, and Saf-Tee has given no notice of termination or withdrawal. Saf-Tee is consequently still bound by the New York—Local # 2 agreement. *See* 29 U.S.C. § 158(d); *O'Hare v. General Marine Transp. Corp.*, 534 F.Supp. 120, 128 (S.D.N.Y.1981), *aff'd*, 740 F.2d 160 (2d Cir. 1984); *Irwin v. Carpenters Health and Welfare Trust Fund*, 745 F.2d 553 (9th Cir.1984). Consequently, no basis for staying arbitration proceedings has been presented and the stay will be dissolved.

The alleged Brooklyn Association—Local # 2 agreement is void. Consequently, the stay entered by Judge Nickerson is dissolved, and the plaintiffs' motion for summary judgment is granted. Judgment will be entered for the plaintiff in *Local 2 v. Contracting Plumbers*, 84 Civ. 7239.

*Leonard Meyerson and William Gross, et al. v. Contracting Plumbers Association*, 84 Civ. 709 remains open pending resolution of the counterclaims. The plaintiffs are directed to submit a proposed judgment in 84 Civ. 7239.

IT IS SO ORDERED.