945 F.2d 889
 138 L.R.R.M. (BNA) 2433, 60 USLW 2243,
120 Lab.Cas. P 10,972
 Kelly MERK, Joseph Staszewski, and Vickie Menagh et al., on
Behalf of Themselves and all Others Similarly
Situated, Plaintiffs-Appellants,
v.
JEWEL FOOD STORES DIVISION OF JEWEL COMPANIES, INCORPORATED,
American Stores Company, Incorporated, and United Food and
Commercial Workers Union Local No. 881, Chartered by United
Food and Commercial Workers International Union, AFL-CIO and
CLC, Defendants-Appellees.
 No. 90-2184.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 13, 1990.
Decided Sept. 27, 1991.
Rehearing and Rehearing In Banc
Denied Dec. 20, 1991.
 
 Daniel R. Formeller, William Cremer (argued), Francis Spina, David W. Groundwater, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for plaintiffs-appellants.
 Max G. Brittain, Jr. (argued), Marcia E. Goodman, John J. Murphy, Jr., Kovar, Nelson, Brittain, Sledz & Morris, Chicago, Ill., for Jewel Food Stores Div. of Jewel Companies, Inc. and American Stores Co., Inc.
 Jairus M. Gilden, Neal D. Rosenfeld, Jonathan D. Karmel, Rosenfeld & Karmel, Chicago, Ill., for United Food and Commercial Workers Union Local No. 881, chartered by United Food and Commercial Workers Intern. Union, AFL-CIO and CLC.
 Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This case involves application of the parol evidence rule to the unique context of collective bargaining agreements. Specifically, we must determine the legal significance of secret oral negotiations between union officials and company management that modify central terms of a collective bargaining agreement which was submitted to the union membership for ratification without any notice that it would be conditioned by additional terms.
 
 I.
 
 2
 The relevant facts are as follows. Jewel Food Stores (Jewel) operates approximately 180 supermarkets in and around Chicago, employing over 15,000 workers who are represented by Local 881 of the United Food and Commercial Workers Union (the Union). In September 1982, Jewel and the Union began negotiating a new collective bargaining agreement (the CBA) to run from September 15, 1982 to June 15, 1985. Negotiations culminated in a contract which was reduced to writing and ratified by the Union membership on January 27, 1983. The CBA established wage rates, vacation leave and other terms of employment for the duration of the contract. Section 4.1 of the CBA, in particular, specified that "During the term of this Agreement, the Employer agrees to pay not less than the minimum wage rates set out in Appendix A."
 
 
 3
 Had the CBA embodied the entire agreement between the parties, this case would have been easily resolved. But the outcome of negotiations was not so straightforward. Anxious about the potential entry into the Chicago market of warehouse competitors such as Cub Foods, Jewel insisted that the CBA contain a "most favored nations" clause, a provision that would allow it to match the wages of unionized competitors opening in the Chicago market after the start of the contract term. The Union refused this demand throughout the negotiations, and the final compact did not include a most favored nations clause. Just before the CBA was approved, however, Union president Fred Burki and two Jewel representatives--Neil Petronella, chief negotiator, and Marsh Collins, corporate vice president--forged a secret deal at an informal hallway meeting late in the evening of January 23, 1983. The precise terms of that deal are in dispute: Union officials claim that all they promised was to "sit and discuss" Jewel's competitive position once Cub Foods entered the Chicago market whereas Jewel executives contend that they agreed to "an economic reopener with full reservation of rights." An economic reopener provision permits the company to reopen all economic terms of the CBA upon occurrence of the condition precedent. Negotiations may then proceed as if the parties were bargaining over a totally new contract, and both sides retain their respective economic weapons, including the Union's right to strike and the company's right to lock out or unilaterally implement a final offer after bargaining to impasse. Whatever the terms of the secret oral agreement between Union officials and Jewel management, both sides affirm that it was never disclosed to or ratified by the Union rank and file even though ratification is required under the Union constitution and bylaws.
 
 
 4
 Cub Foods' entry into the Chicago market in 1983 precipitated this dispute. Shortly thereafter, Jewel announced the reopening of contract negotiations. On February 26, 1984, when negotiations reached impasse, Jewel unilaterally implemented its final offer, cutting the wages of its employees below levels mandated by the CBA. Jewel slashed wages by as much as $1.25 an hour and reduced vacation and personal day benefits as well. The Union immediately filed an unfair labor practice complaint and sued to compel arbitration. The district court ordered Jewel to arbitrate. After an arduous course of negotiations, the Union and Jewel finally resolved their longstanding dispute on the eve of expiration of the CBA: Jewel agreed to award backpay to its current employees while the Union pledged to relinquish its unfair labor practice complaint and the district court suit. At Jewel's insistence, however, the settlement abandoned the plaintiffs in this case--a class comprising approximately 2,000 Jewel employees who retired, quit or were fired during the protracted 15-month battle.
 
 
 5
 Claiming the back wages to which they believed they were rightfully entitled under the CBA, plaintiffs filed suit against the Union for breach of its duty of fair representation and against Jewel for breach of contract. The district court granted summary judgment for the Union, ruling that the Union owed no duty of fair representation to former employees. 641 F.Supp. 1024 (N.D.Ill.1986). In an interlocutory appeal, this Circuit upheld the district court's ruling, 848 F.2d 761 (7th Cir.1988), and the Supreme Court denied certiorari, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988).
 
 
 6
 Plaintiffs' breach of contract action against Jewel, however, proceeded to a one-week jury trial. After the jury returned a verdict in favor of Jewel, plaintiffs moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. The district court denied both motions, examining and rejecting each of plaintiffs' arguments in turn. Invoking the parol evidence rule, plaintiffs first contested the district court's admission of extrinsic evidence regarding the oral reopener to modify the provisions of the written CBA. But the district court submitted the parol evidence issue to the jury because it was not clear from the face of the CBA whether it was intended to embody the parties' entire agreement. The jury determined that the CBA was not integrated and the district court apparently agreed with this conclusion, upholding the jury's verdict as supported by the evidence. The district court also dismissed plaintiff's second argument, ruling that oral modifications to a written CBA do not violate national labor policy. Finally, it held that lack of ratification did not render the oral reopener agreement invalid. The jury found waiver of the ratification requirement based upon evidence of a past practice of adherence to unratified side agreements. The district court agreed with the jury's conclusion but broadly declared that, in any event, Jewel had a right to rely on the unratified oral reopener absent clear notice that the Union was acting in bad faith against the interests of its members.
 
 
 7
 On appeal, plaintiffs challenge the verdict against them on the following grounds. First, they claim that the district court improperly admitted evidence of the oral reopener agreement in violation of the parol evidence rule. Second, they argue that the oral reopener agreement should not have been enforced because it violated the Union's constitutional requirement that significant terms of the labor contract be ratified by union members. Third, they contend that section 8(d) of the Labor Management Relations Act (LMRA) and national labor policy militate against enforcement of a clandestine oral reopener agreement that contradicts the terms of the written and ratified CBA. Fourth, they maintain that the district court committed numerous evidentiary errors, entitling them to a new trial. Finally, they contest the district court's dismissal of their claim for punitive damages.
 
 II.
 
 8
 We review the district court's denial of judgment notwithstanding the verdict de novo, applying federal common law (rather than the law of any state) to this suit for breach of a collective bargaining agreement. See Mohr v. Metro East Mfg. Co., 711 F.2d 69 (7th Cir.1983). For Congress has accorded labor contracts a special status, authorizing the courts to fashion a body of federal common law governing their enforcement. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957) ("[T]he substantive law to apply in [breach of contract] suits under § 301(a) is federal law, which the Courts must fashion from the policy of our national labor laws."). This special solicitude reflects the fact that the collective bargaining agreement is more than a mere contract--it is "the charter instrument of a system of industrial self-government." United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 570, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring). Ordinary common law contract principles, therefore, cannot simply be imported whole into the labor context and mechanistically applied to collective bargaining agreements. To foster industrial peace and stability, we must instead read collective bargaining agreements with sensitivity to considerations of national labor policy.
 
 A. The Parol Evidence Rule
 
 9
 We must first determine whether the parol evidence rule bars the admission of testimony regarding the secret oral agreement. The parol evidence rule provides that evidence of prior or contemporaneous agreements or negotiations may not be introduced to contradict the terms of a partially or completely integrated writing. See Restatement (Second) of Contracts § 215. A writing is deemed fully integrated if the parties intend it to be the expression of their entire agreement. If they intend the writing to be the final expression of the terms it contains but not a complete expression of all the terms agreed upon--some terms remaining unwritten--the agreement is termed partially integrated. See E. Farnsworth, Contracts 452 (1982). If a writing is only partially integrated, evidence of prior or contemporaneous agreements is admissible to supplement its terms though not to contradict it. If an agreement is completely integrated, however, not even evidence of a "consistent additional term" may be introduced to elucidate the writing. See id.; Restatement (Second) of Contracts § 215.
 
 
 10
 Whether a writing is fully integrated is generally a question of law to be resolved by a court. See Calder v. Camp Grove State Bank, 892 F.2d 629, 631-32 (7th Cir.1990); E. Farnsworth, Contracts 460. A judge and not a jury should ordinarily answer this threshold question because it often requires going beyond the four corners of the written document and scrutinizing the very extrinsic evidence whose admissibility is at issue. See E. Farnsworth, Contracts 456 n. 25 ("[I]f there seems to be some circularity in examining the very evidence whose admissibility is at stake in order to determine its admissibility, it may help to keep in mind that this examination is made as a matter of law in order to determine whether the evidence shall go to the trier of fact."). But the district court entrusted the issue of integration to the jury because the CBA did not on its face clearly indicate whether it was intended to incorporate all the terms of the contract. The jury accordingly heard testimony regarding the oral agreement and concluded that the CBA was not intended to be a complete integration of all the parties' understandings. Because the district court concurred in the jury's verdict that the CBA was not integrated, the parol evidence rule did not apply. Hence the secret side agreement could be introduced to vary or contradict the terms of the written CBA.
 
 
 11
 We agree that the parties did not intend the written terms of the CBA to embody their entire agreement, for neither the Union nor Jewel denies the existence of an additional oral term to the contract--they only dispute its content. Union officials claim that all they promised was to "sit and discuss" Jewel's competitive position once Cub Foods entered the Chicago market. Jewel executives maintain, on the other hand, that they agreed to "an economic reopener with full reservation of rights conditioned on the entry of Cub Foods into the Chicago market." Because both sides concede that there was an additional oral term to their contract, it necessarily follows that the written terms of the CBA did not represent a full integration. And once the CBA was found not integrated as a matter of law, it was proper for the jury to resolve the additional factual question of the precise terms of the oral promise. The jury ultimately believed Jewel's version of the story, concluding that the parties had orally agreed to reopen the economic terms of the contract in the event Cub Foods penetrated the Chicago market. The oral reopener, therefore, became an enforceable part of the CBA.[1]
 
 
 12
 Mechanical application of the parol evidence rule would thus permit Jewel to introduce testimony regarding the oral side agreement. Yet our analysis of the parol evidence issue cannot proceed in a vacuum, abstracted from the particular setting in which it arose. Because this secret oral reopener undercuts obligations specified in a collective bargaining agreement, it inevitably implicates national labor policy. The critical question before us, then, is whether national labor policy allows enforcement of a clandestine oral side agreement that alters fundamental terms of the written and ratified collective bargaining agreement.
 
 
 13
 As the Supreme Court has recognized, a collective bargaining agreement is more than just a contract--it erects a system of industrial self-government. See United Steelworkers, 363 U.S. at 570, 80 S.Ct. at 1347. Indeed, certain terms of the collective bargaining agreement are deemed so important that their negotiation is mandated by law. See Ford Motor Co. v. National Labor Relations Bd., 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). Yet the laws regulating labor relations would have little substance if the central provisions of the collective compact could be nullified by means of secret side agreements. Union officials and management would then be free quietly to barter away basic guarantees contained in the collective bargaining agreement and relied upon by all union members. In a slightly different context, Judge Easterbrook forcefully emphasized the hazards of oral side agreements that alter the terms of a written contract: "[D]efenses based on ... oral side agreements ... are as a class the defenses most likely to breed litigation even when asserted in good faith, and they create manifold opportunities for manipulation by crafty operators." Central States Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1154 (7th Cir.1989) (en banc). To avert industrial strife, collective bargaining agreements must be more secure than garden variety contracts. Accordingly, we hold that national labor policy forbids introduction of prior or contemporaneous secret agreements to contradict fundamental terms of a ratified collective bargaining contract. This secret oral reopener is, therefore, inadmissible and unenforceable as a matter of federal law.
 
 
 14
 A number of courts have similarly refused on grounds of national labor policy to enforce covert oral side agreements that undermine the written collective bargaining agreement. The seminal case of this genre is Gatliff Coal Co. v. Cox, 152 F.2d 52 (6th Cir.1945), where the court adapted the parol evidence rule to the labor context to exclude evidence of an oral agreement that contradicted the terms of the written collective bargaining agreement. In that case, an oral side agreement between Gatliff Coal and union officials allowed the company to pay lower wages than those specified in the collective bargaining agreement. Upon suit by employees compensated under the orally agreed-upon rates, rather than those mandated by the written compact, the court held that the National Labor Relations Act clearly precluded the company's reliance upon a prior or contemporaneous oral agreement to modify the terms of the written collective bargaining agreement. See id. at 56 n. 1.[2]
 
 
 15
 Gatliff Coal was followed in Local 509, Missouri -Kansas-Nebraska-Oklahoma District Council, Int'l Ladies Garment Workers Union v. Annshire Garment Co., 65 L.R.R.M. 2769 (D.Kan.1967), which prophesied that serious evils would ensue from recognition of a secret side agreement negating the terms of the written collective bargaining contract. Invoking national labor policy, the Annshire court declared: "To suppress industrial strife based on this type of controversy, national labor policy requires that the clear and unambiguous requirements of the written collective bargaining agreement be immune from attack founded on a covert side agreement." Id. at 2772; see also N.D.K. Corp. and Food and Commercial Workers, Local 1550 AFL-CIO, 278 N.L.R.B. 151, 122 L.L.R.M. 1253 (1986) ("National labor policy requires that evidence of oral agreements be unavailing to vary the provisions of a written collective-bargaining agreement valid on its face."); Restaurant Employees, Bartenders and Hotel Service Employees Welfare Fund v. Rhodes, 90 Wash.2d 162, 580 P.2d 611, 99 L.R.R.M. 2868 (1978) (federal labor law forbids parol testimony to vary the terms of a written collective bargaining agreement).
 
 
 16
 Ignoring this long line of precedent, however, the district court allowed introduction of the oral reopener to vary the terms of the written CBA. The district court relied upon Mohr v. Metro East Mfg. Co., 711 F.2d 69, to buttress its holding. But our decision is not inconsistent with Mohr, which held only that the parol evidence rule does not prevent an individual employer from modifying an industry-wide collective bargaining agreement reached between an employers association and an international union by means of oral agreements with the union local. As the Mohr court observed:
 
 
 17
 The agreement between the association and the international union was deliberately left incomplete in recognition of the diversity of circumstances to which it had to apply, thus allowing individual employers and their local unions to add to the provisions, whether by supplemental written agreements, or oral agreements, or as in this case by both sorts.
 
 
 18
 Id. at 72-73. Unlike the case at bar, the oral agreement in Mohr was not kept hidden from the Union membership. It dealt, moreover, with a purely peripheral matter regarding the terms of employment for schoolboys. Therefore, parol evidence was admissible in Mohr to supplement the general terms of the industry-wide collective bargaining agreement and to adapt them to local conditions.
 
 
 19
 We do not hold that a collective bargaining agreement must be in writing to be enforced. On the contrary, section 8(d) of the National Labor Relations Act does not require collective bargaining agreements to be in writing unless one of the parties requests that they be. Central States, Southeast and Southwest Areas Pension Fund v. Behnke, 883 F.2d 454, 459 (6th Cir.1989); Gariup v. Birchler Ceiling and Interior Co., 777 F.2d 370, 373-74 (7th Cir.1985); Eastern Washington Distributing Co., 216 N.L.R.B. 1149, 1151 (1975). Section 8(d) thus embodies a considered decision to allow oral collective bargaining agreements when both parties prefer them. Hamilton Foundry & Machine Co. v. International Molders and Foundry Workers Union, 193 F.2d 209, 214 (6th Cir.1952). Therefore, a collective bargaining agreement may be partly or wholly oral as well as partly or wholly in writing, and a written collective bargaining agreement may be orally modified. Certified Corp. v. Hawaii Teamsters and Allied Workers, 597 F.2d 1269, 1271-72 (9th Cir.1979).
 
 
 20
 The real danger posed by this reopener agreement stems from its secrecy and not simply from its oral character. No one disputes that the oral reopener was, at the behest of Union officials, deliberately concealed from the union membership. In a precursor to the present litigation, Jewel filed a counterclaim alleging that the Union had breached the oral reopener agreement in violation of section 301. In denying Jewel's counterclaim, Judge Getzendanner perceptively singled out the vice of this secret side agreement:
 
 
 21
 [The] oral agreement is inadmissible and unenforceable under the parol evidence rule as a matter of federal law.... Jewel's argument that the written contract is not a complete integration is insufficient to avoid application of the parol evidence rule since even a partially integrated written agreement cannot be contradicted by evidence of a prior oral understanding. This rule is particularly important in the context of labor relations, lest union leaders engage in side agreements unknown to the rank and file membership.
 
 
 22
 United Food & Commercial Workers Union v. Jewel Food Stores, No. 84 C 1648 (N.D.Ill. April 8, 1985) (Getzendanner, J.). The economic reopener strikes at the heart of the CBA: it throws open the most central provisions governing wages and benefits upon the entry of Cub Foods into the Chicago market. Yet Jewel and the Union explicitly collaborated to keep the oral reopener hidden from the rank and file membership despite its paramount significance. Thus Union members who reasonably believed that they were guaranteed a fixed rate of pay for the duration of the CBA unexpectedly found their wages slashed at mid-term. Under these circumstances, enforcement of an oral reopener that was concealed and withheld from ratification by the membership is certainly in derogation of national labor policy.
 
 B. The Ratification Requirement
 
 23
 Our holding does not rest solely upon Gatliff Coal, which completely eschewed all evidence of prior or contemporaneous agreements modifying the provisions of a collective bargaining agreement. For the facts of this case acquire their significance from the use of secrecy and the failure to seek ratification from the Union membership. We emphasize that non-ratification was coupled here with a deliberate policy of secrecy--a factor which is crucial to our analysis. Federal law does not itself require ratification of a collective bargaining agreement. In this case, however, the Union's own constitution and bylaws mandate that collective bargaining agreements be ratified. Jewel understood, moreover, that the oral reopener had not been ratified by the Union membership in violation of the Union constitution. Failure to ratify under circumstances where an employer is aware both of the ratification requirement and of the failure to comply with it may invalidate an employer's claims under the unratified agreement. See Goclowski v. Penn Central Transportation Co., 571 F.2d 747, 756-58 (3d Cir.1977); Meyerson v. Contracting Plumbers Ass'n, 606 F.Supp. 282 (S.D.N.Y.1985).
 
 
 24
 Jewel argues, however, that a past practice of non-ratification of contract terms could establish waiver of the ratification requirement. See Central States Southeast and Southwest Areas Pension Fund v. Kraftco, Inc., 799 F.2d 1098, 1113-14 (6th Cir.1986). In Kraftco, the Sixth Circuit suggested in dicta that waiver of the ratification requirement could be imputed from well-entrenched practices and customs amounting to an established history of non-ratification. Yet Jewel has failed to demonstrate any established history of non-ratification of substantial terms of the labor contract. It is true that peripheral terms of the contract involving personal days, fatigue mats and the cluster group seniority system were generally viewed as binding even though unratified. But these provisions do not rise to the level of significance of a reopener that abrogates basic wage provisions upon the occurrence of a specified condition. The reopener involved a matter of fundamental importance--it dealt with the central question whether any of the employees in the bargaining unit could rely upon the level of wages ostensibly guaranteed by the CBA for its duration. It is disingenuous to equate such a provision with the terms regarding fatigue mats or the rollback of paid personal days. In fact, the reopening of labor contracts during their term is deemed so significant that it is expressly forbidden by Section 8(d) of the National Labor Relations Act except when provided by contract. This provision argues strongly against unratified reopeners. See generally Texaco v. National Labor Relations Bd., 722 F.2d 1226 (5th Cir.1984); Meyerson, 606 F.Supp. 282.
 
 
 25
 We decline Jewel's invitation to infer waiver of the ratification requirement from past instances of non-ratification involving contract terms of such trifling magnitude. To do so would be counter to national labor policy. It would encourage unions to submit every issue--no matter how trivial--to the membership for ratification out of fear of waiver. Failure to ratify routine matters, therefore, should not be deemed a blanket waiver of the ratification requirement as to the essence of a collective bargaining agreement.
 
 
 26
 In its strenuous efforts to establish a past practice of waiver, Jewel can point to only one meaningful instance of non-ratification. An unratified provision of the 1969 collective bargaining agreement between Jewel and the Union allegedly allowed wages to be reopened and renegotiated upwards in the event that the Teamsters Union attempted to organize the workers. But any resemblance between the 1969 reopener and the 1983 reopener stops short at the surface, for the 1969 provision furthered the interests of all parties: Jewel benefited by keeping the Teamsters out of its stores, the Union benefited by retaining its membership and the members benefited by gaining a possible raise in salary. Such a provision, therefore, is hardly analogous to a controversial wage reopener allowing Jewel to cut wages unilaterally in the event that another employer paying lower wages entered the market.
 
 
 27
 The district court found failure to ratify the reopener immaterial even in the absence of any past practice of non-ratification. Citing Chrysler Workers Ass'n v. Chrysler Corp., 834 F.2d 573, 582 (6th Cir.1987), the court broadly pronounced that Jewel had a right to rely upon its agreement with the Union whether or not it was ratified absent clear notice that the Union was acting in bad faith against the interests of its members. See Merk v. Jewel Food Stores, 734 F.Supp. 330 (N.D.Ill.1990). The district court's interpretation of Chrysler Workers, however, is inapposite. For Chrysler Workers involved a side letter agreement between a union and a former employer which dealt only with certain workers' transfer rights. Such an agreement is hardly comparable to a provision which could potentially result in the lowering of the wage level of workers in the bargaining unit across the board. Of even greater importance, moreover, is the fact that the side agreement involved in the Chrysler Workers case was not kept hidden from the union membership. Notice and an explanation of the side agreement were, on the contrary, readily available to all union members:
 
 
 28
 Shortly after the letter agreement the Union put plaintiffs and other "work opportunity employees" who had transferred to the Lima plant on notice of a meeting to be attended by international union representatives in July of 1982 to "explain the agreement and to answer questions." There was no affirmative act of concealment.
 
 
 29
 834 F.2d at 582. By contrast, in the present case the economic reopener was deliberately concealed from the membership and Jewel participated at least passively in this concealment.
 
 
 30
 Union officials explicitly enjoined Jewel management to keep the reopener secret. Jewel is hardly an unsophisticated employer. Aware of the secrecy surrounding the oral reopener, it must have drawn the obvious conclusion that the terms of the side agreement would not be submitted for ratification or even disclosed to the Union membership. Jewel now argues that it believed the secrecy was intended solely to keep the reopener hidden from the International Union. But whether concealment was motivated by a desire to keep the side agreement from the membership or from the International is irrelevant: the reopener was in fact kept from the membership and Jewel was on notice of this fact. Subsequently, when it was submitted to the membership in connection with the present plaintiffs' suit against the Union, this same reopener was overwhelmingly voted down. It would not have been difficult for Jewel to predict that such a provision would have been at least highly controversial and might well have been overwhelmingly defeated by vote of the membership. We need not close our eyes to industrial realities.
 
 
 31
 Jewel now argues, however, that the reopener may not have been ultimately to the detriment of the membership. Perhaps the oral reopener stood in place of the most favored nations clause initially sought by Jewel, a provision which might have been even more onerous to the membership. Or perhaps Jewel would not have agreed to as high a wage level as it did had it not been able to obtain the oral reopener. But it is not for us to decide whether the reopener would have ultimately benefited or harmed the Union membership. All that is clear is that the reopener was a matter of critical concern that should have been disclosed to the membership and submitted for ratification. Union leaders may actually comprehend the needs of their members better than the members do themselves. This type of paternalism, however, is hardly consonant with the accepted principles of union democracy enshrined in the federal labor laws. Accordingly, we hold as a matter of federal law that Jewel was not entitled to rely upon a reopener that it knew was not ratified, or even disclosed to the union membership, in violation of the Union constitution.[3]
 
 
 32
 The dissent concedes that an agreement by an agent without actual or apparent authority is empty under the law. As the dissent points out, union officials lacked actual authority to agree to an unratified reopener and they lacked apparent authority because Jewel knew of the ratification requirement but acquiesced in a deliberate policy of secrecy. The dissent attempts to avoid the logical consequences of its concessions, however, by reiterating Jewel's argument that a past practice of non-ratification of contract terms demonstrated waiver of the ratification requirement. In particular, the dissent focuses upon the unratified 1969 reopener. According to the dissent, the nub of our argument is that "[r]eopeners are OK when they help the employees ... but not when they help the employer." Infra at 906. But the dissent obviously mischaracterizes our holding. Non-ratification of the 1969 reopener is unproblematic not because it might have benefited the membership but rather because it would clearly have been ratified. The 1969 reopener was not a burden but a benefit whose ratification would have gone unquestioned. For surely no one would or could complain of concealment of a benefit. This is tantamount to being pleasantly surprised by a gift.
 
 
 33
 The 1983 reopener, on the other hand, concealed a burden (a potential wage reduction) from the membership against whom it was later enforced. Purporting to evenhanded treatment of both sides, the dissent maintains that secret side agreements should be enforced equally whether they redound to the benefit of the employer or the employee. Despite its seductive symmetry, however, the dissent's argument is substantively flawed. For with respect to information, employers stand in a position radically different from employees. Employers are apprised of every facet of the collective bargaining agreement--oral or written, secret or publicized to all the world. Thus no aspect of the collective bargaining agreement--whether it is beneficial or detrimental--catches the employer by surprise.
 
 
 34
 The dissent insists for unexplained reasons upon the dubious proposition that labor is a commodity of the same order as coal, a view that is definitively refuted by the law: "The labor of a human being is not a commodity or article of commerce." Section 6 of the Clayton Act, 15 U.S.C. § 17; see also Transportation-Communication Employees v. Union Pacific R.R., 385 U.S. 157, 160-61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966) ("A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts."). The dissent also trumpets the need for flexibility in labor relations. Flexibility may be a virtue in collective bargaining agreements but it should hardly extend to surreptitious downward adjustments of basic wages. Such changes, if concealed, are highly destabilizing, producing strikes and lawsuits which the national labor policy does indeed eschew. The dissent protests overmuch about Gatliff Coal, which takes the common-sense position that paying wages based upon an oral side agreement (presumably undisclosed to the employees) in the face of a written contract for higher wages violates national labor policy because it obviously promotes industrial unrest and bitter controversy. Disparaging Gatliff Coal as old and outmoded, the dissent cites no more recent case on point.[4] The dissent is unable to find any case which holds contra to Gatliff Coal. That is probably because the principles of fairness underlying Gatliff Coal are still central to the labor law of the land.
 
 C. Punitive Damages
 
 35
 Finally, plaintiffs' request for punitive damages must fail. The district court properly concluded that punitive damages should not be awarded in this suit for breach of a collective bargaining agreement. As the district court cogently reasoned, if punitive damages are not available for breach of the duty of fair representation, see International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), then they are surely not available for a simple breach of contract. For astronomical damages might threaten the goal of harmonious resolution of labor disputes which is at the core of national labor policy. At the very least, we should not award punitive damages in this case because it involves at worst a simple breach of contract uncomplicated by evidence of fraud or other tortious misconduct. See Patton v. Mid-Continent Systems, Inc., 841 F.2d 742, 750-51 (7th Cir.1988).
 
 III.
 
 36
 The district court apparently examined each of plaintiffs' arguments in isolation, overlooking their combined significance. One by one, the court addressed the parol evidence rule, the Union's ratification requirement and national labor policy. Taken individually, as the district court did here, none of plaintiffs' arguments may be dispositive. Read together, however, they clearly illuminate the grave dangers posed by a backroom deal that is secretly negotiated between union officials and company management without the knowledge or consent of the union rank and file. The district court's decision is therefore REVERSED and REMANDED for further proceedings consistent with this opinion.
 
 
 37
 EASTERBROOK, Circuit Judge, dissenting.
 
 
 38
 An employer, fearing a rival with a reputation for low wages (more to the point, low prices) demands a most-favored-nations clause, under which it would receive the benefit of any concessions the union makes to the rival. Unions prefer not to make such bargains. A strike looms: the employer will not sign a contract without a most-favored-nations clause, and the union will not sign a contract with one.
 
 
 39
 At the last minute they agree to replace the contested clause with a reopener. Although the contract is to run for three years, if the dreaded competitor enters the market sooner either side may renew negotiations with the usual privileges: after good faith bargaining to impasse, the employer may implement its final offer, the union may strike, or both. Electrical Workers Local 47 v. NLRB, 927 F.2d 635 (D.C.Cir.1991). A reopener can work in either side's favor depending on economic conditions. It does not modify or contradict any other term of the contract; it is part of the terms, giving each side an option.
 
 
 40
 The rival entered; the employer exercised the right to reopen; union and employer bargained to impasse, and the employer implemented its final offer. When the dust settled the union retained the fundamental terms of the contract (including wages) and won back pay for its members. But it did not seek back pay for employees who left the firm before that settlement. These employees tried to tax the union with breach of its duty of fair representation but lost. Merk v. Jewel Companies, Inc., 848 F.2d 761 (7th Cir.1988). So also the ex-employees lost their contract suit against the employer. A jury determined that the deal was as I have described it, that the plaintiffs received their contractual due.
 
 
 41
 The reason this case went to a jury at all is that the reopener was oral, while the bulk of the pact was written. But as the union conceded that there had been an oral side agreement, disputing only the employer's description of its content, the parol evidence rule did not prevent the jury from determining whose version is correct. My colleagues agree with the trial judge, 734 F.Supp. 330 (N.D.Ill.1990), and 1990 WL 71027, 1990 U.S.Dist. LEXIS 5486, that the doctrines applied to commercial cases enforce that oral agreement. Had this been a long-term contract for coal with an oral agreement to renegotiate the price if a low-cost strip mine should open, or a contract to build a skyscraper with an oral agreement to renegotiate the number of stories if the real estate market should collapse, the agreement could be enforced.
 
 
 42
 But not when the commodity is labor, the majority says. If my colleagues thought there was some problem with the feeble enforcement of the parol evidence rule in modern litigation, I would share their concern. The parol evidence rule and the statute of frauds reduce the costs of fabrication, litigation, and error--at the expense of making the bargaining process less flexible and withholding enforcement of some bargains. Most courts today think the costs of strict insistence on written instruments excessive. Whether they are right in believing this is an interesting question. What the majority does, however, is not signal a revival of the writing requirement; it maintains, instead, that labor law is different. What, then, is the source of the difference?
 
 
 43
 My colleagues point to "national labor policy", which they say mandates that "collective bargaining agreements must be more secure than garden variety contracts." 945 F.2d at 894. Labor policy may be found in labor statutes. It turns out that the National Labor Relations Act does not forbid oral agreements. Quite the contrary, the Act requires only one sort of agreement to be in writing. Pension plans must be written down, and the writings will be strictly enforced on command of both labor, 29 U.S.C. § 186(c)(5)(B), and pension, 29 U.S.C. § 1145, laws. See Central States Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148 (7th Cir.1989) (in banc). When Congress singles out one kind of agreement for a strict writing requirement (as it did to protect the interests of the pension plans, which are not present at the bargaining table), it makes sense to infer that labor and management may decide for themselves how formal the rest of their dealings shall be. If labor policy really emphasized stability (and protection of workers from their own leaders' "backroom deals", 945 F.2d at 899), the NLRA would require the commitment of all agreements to writing, would require leaders to submit them to vote by members, and would require the written pact to be circulated far enough in advance of the vote that it could be digested and intelligently debated. Labor law requires none of these things, as my colleagues concede, id. at 895. By any reckoning, ordinary commercial contracts--to which §§ 2-201, 2-202, and 2-209 of the Uniform Commercial Code apply--are more secure against disputes about oral colloquies than are labor agreements governed by § 8(d) of the NLRA, 29 U.S.C. § 158(d). Labor law emphasizes flexibility, not certainty.
 
 
 44
 Flexibility is a commodity negotiators value, and not only because it is impossible to write down all of the understandings and practices (even all of the "important" understandings and practices) that make up the terms and conditions of employment. Collective bargaining agreements are relational contracts. They do not settle all important terms; rather they establish a framework within which the parties compose their differences.
 
 
 45
 It is perverse to say that the contracting process in labor must be more formal than the contracting process in shipping or construction or natural resources. You can define how much coal to sell and where to deliver it; you can set the duration of a charter party. Labor agreements govern the ongoing relations among thousands of persons and affect matters not so easy to specify. Rigidity backfires. Competitive conditions and technology change. Labor relations must change too, even over so short a period as three years. Failure to adjust to new developments means failure in product markets (look at the automobile and railroad industries), and when the employer slips in product markets labor takes the fall. If a low-price rival enters and siphons business, a firm bound to pay high wages will lay off many workers. Layoffs hurt the employees with the shortest tenure--that is, the persons who are plaintiffs in this case. Greater flexibility promotes responses in the marketplace that may benefit both sides.
 
 
 46
 Ongoing accommodation is a hallmark of labor relations. Representatives of labor and management meet continually to discuss both individual grievances and more general questions. Changes may ensue, with or without written agreements. "[T]he parties to a CBA [collective bargaining agreement] may tacitly acquiesce to an amendment of the agreement through their course of dealing." Matuszak v. Torrington Co., 927 F.2d 320, 324 (7th Cir.1991). Because labor and management recognize that even this process cannot be comprehensive, they deputize arbitrators to resolve still more issues. Arbitrators sometimes are limited to grievances, but more commonly their powers extend to all interpretive debates. Courts regularly say that arbitrators are not bound by the parol evidence rule, that because collective bargaining agreements are incomplete, and so much of labor relations consists in oral understandings, arbitrators may use these oral exchanges to supplement or even contradict the written terms. E.g., SEPTA v. Railroad Signalmen, 882 F.2d 778, 784 (3d Cir.1989); Loveless v. Eastern Air Lines, 681 F.2d 1272, 1279-80 (11th Cir.1982); NLRB v. L.B. Priester & Sons, Inc., 669 F.2d 355, 365 (5th Cir.1982); Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Independent Truck Drivers Union, 611 F.2d 580 (5th Cir.1980); Machinists v. Sargent Industries, 522 F.2d 280 (6th Cir.1975); Tolbert v. Union Carbide Corp., 495 F.2d 719, 721 (4th Cir.1974). If my colleagues are right, these decisions must be wrong.
 
 
 47
 The Supreme Court has said repeatedly that labor relations require more flexibility than the common law allows--not, as my colleagues hold, more formality. E.g., Transportation--Communication Employees v. Union Pacific R.R., 385 U.S. 157, 160-61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966) ("A collective bargaining agreement is not ... governed by the same old common-law concepts which control such private contracts. ... In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements."); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-81, 80 S.Ct. 1347, 1350-52, 4 L.Ed.2d 1409 (1960); McKinney v. Missouri-Kansas-Texas R.R., 357 U.S. 265, 273-74, 78 S.Ct. 1222, 1227-28, 2 L.Ed.2d 1305 (1958). See also Consolidated Rail Corp. v. Railway Labor Executives' Association, 491 U.S. 299, 308-09, 109 S.Ct. 2477, 2483, 105 L.Ed.2d 250 (1989) (describing "flexibility" as a hallmark of labor relations under both the NLRA and the Railway Labor Act and adjuring courts not to disfavor informal arrangements).
 
 
 48
 Flexibility entails giving labor and management the option of having a fully integrated agreement, of banning oral side agreements, as well as the option of coming to partially-written, partially-oral understandings. My colleagues concede that this agreement, which lacked an integration clause, did not ban oral understandings. Our question is whether labor law forbids such side agreements even when the parties decide against an integrated writing. A handful of cases say that it does; the majority relies on Gatliff Coal Co. v. Cox, 152 F.2d 52 (6th Cir.1945), and a smattering of unreviewed decisions by district courts, all more than a generation old. Gatliff rests in part on the premise that the NLRA "contemplates that a collective bargaining agreement be in writing", 152 F.2d at 56, which it obtained by misreading H.J. Heinz Co. v. NLRB, 311 U.S. 514, 523-26, 61 S.Ct. 320, 324-26, 85 L.Ed. 309 (1941). Heinz holds that it is an unfair labor practice for the employer, having reached an agreement with the union, to refuse to sign a document embodying its agreement. That labor is entitled to a written memorial of a bargain hardly shows that labor is forbidden to reach oral understandings with management. Gatliff dealt with a common problem: a member of a multi-employer bargaining unit refused to sign the pact the association reached with the union, pleading that local officials said that it would not have to. Today a belated effort to withdraw from a multi-employer unit would be dealt with as an unfair labor practice, see Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), and not as a problem of parol evidence. After the Labor Board resolved the multiemployer unit problem in 1958, Retail Associates, Inc., 120 N.L.R.B. 388 (1958), Gatliff vanished without a trace.[1] More recent cases in the Supreme Court (e.g., Conrail and Union Pacific ), in the sixth circuit (e.g., Sargent ), in our own circuit (e.g., Matuszak ), and in other circuits take a different approach to contractual formalities. For example, the fifth circuit believes that the parol evidence rule does not apply at all in labor law. Manville Forest Products, Inc. v. Paperworkers Union, 831 F.2d 72, 75-76 (5th Cir.1987). Going to the extreme opposite from my colleagues, Manville said that "national labor policy" forbids labor and management to have a fully integrated contract no matter how strongly they prefer the benefits of certainty.[2] See also Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico, 583 F.2d 1184 (1st Cir.1978); cf. Bokunewicz v. Purolator Products, Inc., 907 F.2d 1396, 1401-02 (3d Cir.1990). I am no more enamored of an approach that dishonors attempts to put everything in writing than I am of an approach that dishonors oral agreements when the parties did not want their writings to be complete. There is a happy middle ground: Parties may choose for themselves.
 
 
 49
 This sets up the majority's argument that the union did choose to exclude oral agreements, by requiring ratification of the pact by the membership. Technically, the argument is that the union's negotiators lacked actual authority to agree to a reopener, because the union's constitution requires ratification, and they lacked apparent authority because Jewel not only knew about this requirement but also understood that the union's negotiating team was not going to tell the membership about the reopener. Notice that this argument does not supply any reason to differentiate labor law from other bodies of law. "Agreement" by an agent lacking both actual and apparent authority is empty in all corners of the law. Claims about how labor law is special melt away if, in the end, this case is about the negotiators' lack of authority.
 
 
 50
 Four issues precede the question whether defects in the ratification process prevent enforcement of the reopener. First: do provisions of a union's constitution affect the validity of labor agreements? The National Labor Relations Board thinks not. McLaughlin & Moran, Inc., 299 N.L.R.B. No. 7 (1990), holds that once the responsible officials of a union report to the firm that the union has approved an agreement, it is binding--even if the union did not follow prescribed procedures. The Board wrote that "it is none of the Employer's business how (or even whether) the [Union] obtains the employees' approval" of the agreement, and that "it is for the union, and not the employer, to construe the meaning of the union's internal requirements for ratification." Any other approach, the Board thought, would make it "difficult, if not impossible, for the parties to a collective-bargaining agreement to arrive at a final settlement without the fear of being forced into protracted litigation regarding the union's compliance with its own procedures, clearly a collateral issue. The encouragement of such industrial instability could not have been with the intendment of the Act." McLaughlin & Moran reiterates a doctrine the Board has applied for decades. E.g., NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712 (2d Cir.1967); Houchens Market of Elizabethtown, Inc. v. NLRB, 375 F.2d 208, 211-12 (6th Cir.1967); NLRB v. Darlington Veneer Co., 236 F.2d 85, 88 (4th Cir.1956). Darlington holds that the union's ratification procedures affect the validity of the agreement only to the extent the employer accepts them; otherwise labor law makes the word of the negotiators the union's bond. To put this differently: Labor's negotiators have authority, as a matter of federal law, no matter what the union's internal procedures may be. This principle is conclusive against plaintiffs. I cannot find any contrary holding. Yet my colleagues, who extoll the importance of stability, also promote the sort of litigation regarding internal union procedures that, the Board and other circuits believe, undermines stability.
 
 
 51
 Second: if contrary to McLaughlin & Moran the union's procedures matter, did Jewel know that the union's rules required ratification term-by-term, and that the local's officers would keep one term under wraps? Unless Jewel knew, the union's officers acted with apparent authority. Jewel denies having this knowledge, and the jury's verdict hardly resolves this question against it. The majority distinguishes McLaughlin & Moran because that employer lacked knowledge of union's internal rules while ignoring Jewel's protest that it was in the same position. At all events this factor plays no role in the Board's analysis or that of other circuits.[3] Third: does a defect in ratification apply exclusively to the oral portions of the agreement? Why should Jewel be bound by the provisions favorable to the union (those the union's officers told the members about) but be unable to avail itself of the provisions favorable to itself? Ratification, one would think, is an all-or-nothing business. Fourth: why is Jewel, as opposed to the union, answerable to persons injured by defects in the ratification process? As the majority paints this picture, the union's officers set out to hoodwink the members by keeping under wraps a reopener agreement that the members would oppose. Such a wrong sounds distinctly like a breach of the duty of fair representation. Yet three years ago this court held that these plaintiffs may not recover from this union on such a theory. 848 F.2d 761. Suppose the majority could surmount these obstacles. More remain.
 
 
 52
 Nothing in the union's constitution requires the officers to submit written documents to the members for perusal before a vote. This local does not circulate agreements to its members. Once the negotiating team reaches an agreement with management, the officers call a meeting at which they recount the terms they think significant. They are free under both the international union's constitution and their own practices to trumpet the features they deem salient while overlooking concessions to management. Of course members may ask questions during debate, but there is no indication in this record that anyone asked whether the agreement included a reopener, let alone that the officers answered falsely. Treating a ratification requirement as if it were a writing requirement is a serious misstep.
 
 
 53
 Practice illuminates how the union understood the meaning of ratification. The jury found--as the parties agree--that union and management routinely left matters including the number of personal days off and details of the seniority system to oral agreements that were not described to the members before ratification. Judge Posner asked the jury to decide whether under the parties' practice an agreement had to be written in order to be valid. The jury determined that writing was unnecessary. My colleagues deem details such as seniority and days off to be trivial--questionable as an original matter, but no ground for upsetting the jury's contrary decision on the same point.
 
 
 54
 Especially not when one of the examples presented to the jury was--another oral reopener agreement! The trial judge wrote:
 
 
 55
 Merk's argument from triviality is contradicted by the evidence of a reopener agreed to in 1969. That agreement was premised upon a raid, not by Cub Food, but by the Teamsters, and allowed the contract to be reopened to renegotiate higher wages. If the jury concluded that there was an agreement to reopen the contract in 1969, as it could have, and that that agreement was not ratified, then the agreement in this case was no more significant to Jewel than the 1969 reopener was to the Union, and could be valid even if unratified.
 
 
 56
 1990 WL 71027 at *5, 1990 U.S. Dist. LEXIS 5486 at *13-14 (emphasis in original). Given the protection the seventh amendment accords to jury verdicts, you would think this evidence conclusive. But no; the majority says that the 1969 reopener is different because "the 1969 provision furthered the interests of all parties: Jewel benefited by keeping the Teamsters out of its stores, the Union benefited by retaining its membership and the members benefited by gaining a possible raise in salary." 945 F.2d at 897 (emphasis in original). This sounds more like a lawyer's closing argument to a jury than like a reason why the jury's verdict must be set aside. After page 893 of the majority's opinion (where it concludes that the jury could enforce the oral reopener under the rules usually applied in civil litigation), you do not encounter the word "jury" again. My colleagues make de novo findings on all factual disputes and draw their own inferences.
 
 
 57
 Disposing of a raft of oral agreements on the ground that they are trivial, and of a vital oral agreement on the ground that it could propel wages upward, supports a decision for these plaintiffs only at substantial damage to other values. Recall that the majority started from the premise that "collective bargaining agreements must be more secure than garden variety contracts." 945 F.2d at 894. How is the agreement "more secure" if labor and management cannot know whether it is binding until they obtain the views of three appellate judges on how "important" it is? Importance lies in the eye of the beholder (I think that seniority provisions do not belong in the "trivial" class to which my colleagues consign them). Worse, the majority makes it clear that enforceability depends on who wins and who loses ex post. Negotiators need to know while they are dickering which agreements will be enforced and which not; people at the bargaining table in January 1983 cannot wait for a court in September 1991 to tell them which deals are sufficiently unimportant, and which turn out sufficiently favorable to the workers, to be enforced.
 
 
 58
 Consider again the position of the parties when Jewel was insisting on the most-favored-nations clause. What options had they?
 
 
 59
 . They could have reached impasse, followed by Jewel's implementation of its final offer (including the most-favored-nations clause), which might have precipitated a strike. All workers either would have been subject to the most-favored-nations clause (if they continued to work on Jewel's terms) or would have lost wages during the struggle. Jewel might or might not have been able to "break" the union during a strike.
 
 
 60
 . They could have signed an agreement with a most-favored-nations clause. The membership might have ratified this (with results less favorable to the employees than what actually happened) or might have rejected it (with the same results as impasse).
 
 
 61
 . They could have signed an agreement with a written reopener. The membership might have ratified this (with results less favorable to the employees than what actually occurred--recall that uncertain enforceability of the oral reopener led Jewel to compromise with the union) or might have rejected it (with the same results as impasse).
 
 
 62
 . They could have signed a one-year rather than a three-year agreement, with effects fundamentally the same as a three-year agreement plus a reopener.
 
 
 63
 . They could have signed a three-year agreement without a reopener, but with lower salaries and benefits to compensate Jewel for the risk it was taking.
 
 
 64
 . They could have signed precisely the agreement they did, without a reopener. After the low-price rival entered, Jewel could have laid off workers on account of lower sales.
 
 
 65
 None of these is a clear winner for the employees, whose pickle is attributable not to faithless agents but to impending competition in the market. All options are potentially inferior for the employees to the solution the union negotiated. Bargains usually yield benefits for both sides. The union's agents believed that this deal with Jewel was the best one available. It was at the union's behest, not Jewel's, that the reopener was oral rather than written. My colleagues concede all this but reply: "[I]t is not for us to decide whether the reopener would have ultimately benefited or harmed the Union membership." 945 F.2d at 897. This is the wrong question, for we are not trying to determine who won or lost, but whether the 1983 reopener is sufficiently like the 1969 reopener that a jury could conclude that the parties' practice did not require its presentation to the membership in writing. That question is indeed "not for us"; it is for the jury, and we do not learn why the jury could not find the two reopeners sufficiently similar. Suppose, though, that the distribution of benefits were the right question, and judges the right persons to answer it. Why may we not "decide whether the reopener would have ultimately benefited or harmed the union membership" when, on the same page, we make exactly that decision about the 1969 reopener? Either we may inquire into this subject or we may not. If we may, we should examine both reopeners; if we may not, neither. Finding benefits for the union in the 1969 reopener while disclaiming any power to search for benefits in the 1983 reopener is tellingly inconsistent.
 
 
 66
 Neither the parol evidence rule nor the union's ratification requirement vitiates an oral reopener agreement. My colleagues fuse two unsatisfactory theories: "Taken individually ... none of plaintiffs' arguments may be dispositive. Read together, however, they clearly illuminate the grave dangers posed by a backroom deal that is secretly negotiated between union officials and company management without the knowledge or consent of the union rank and file." 945 F.2d at 899. Here the majority announces that the 1983 reopener was bad for the employees--despite its disclaimer at page 897 of authority to inquire into this question. This is special pleading. Reopeners are OK when they help the employees (page 896-97) but not when they help the employer (page 899). Such a disposition bears no resemblance to a rule of law. It is a thumb on the scales of justice.
 
 
 
 [1]
 The jury could in theory have reached another conclusion: it could have determined that the CBA represented a partial integration, at least as to basic economic terms such as wage rates and the duration of the contract. The jury could have found that the written CBA embodied the entire agreement of the parties as to these fundamental terms. Had the jury so concluded, parol testimony could not have been admitted to contradict the CBA although it might still have been introduced to supplement the CBA with respect to collateral matters
 
 
 [2]
 Elaborating at length upon the problem of secret side agreements, the Gatliff Coal court declared:
 In utilizing collective bargaining agreements to implement a National Labor policy designed to remove certain recognized sources of industrial strife by encouraging friendly adjustment of industrial disputes as to wages, hours of work and other conditions of employment, upon a plane of equality of bargaining power between employers and employees, the National Labor Relations Act, in the public interest, has given such collective bargaining agreements a more secure and stable position in our National economy than that of ordinary common law contracts which may be altered at pleasure by rendering ineffectual and unavailable any collateral agreements between individual members of the collective bargaining group designed to obtain a diminution of the obligations of a particular employer or abridgment of the benefits accruing to particular employees under the collective agreement.... To hold otherwise "would reduce the National Labor Relations Act to a mere futility and leave collective agreements no stronger than the weakest members of the union." Statutes requiring collective bargaining would have little substance if what was made collectively could promptly be unmade individually.
 152 F.2d at 56 n. 1 (citations omitted).
 
 
 [3]
 McLaughlin & Moran, Inc., 299 N.L.R.B. No. 7 (1990), does not hold otherwise. In McLaughlin, the union sought to escape a collective bargaining agreement on the grounds that it had failed to follow its own procedures for ratification by allowing casual employees to vote. The National Labor Relations Board concluded, however, that the collective bargaining agreement was binding only because the company had no reason to know or suspect that any mistake had been in the ratification process. "That the [union] may have mistakenly followed the wrong procedures," the Board wrote, "does not absolve it from being bound by the representations [the union negotiator] made to [the company], when [the company] had no way of knowing or even suspecting that a mistake may have been made." Ignoring this careful language, the dissent maintains that an agreement approved by union officials is binding regardless whether or not it is ratified. But the dissent's reading of McLaughlin is far too broad: McLaughlin does not go so far as to allow a company to rely upon an agreement made in flagrant violation of a union ratification requirement even when the company is aware both of the requirement and that it has been flouted
 
 
 [4]
 The dissent cursorily refers to a string of cases which it claims run counter to Gatliff Coal. But, read closely, these cases hold only that parol evidence may be considered to resolve ambiguities or fill in gaps in a written collective bargaining agreement. E.g., Matuszak v. Torrington Co., 927 F.2d 320 (7th Cir.1991) (can look to course of dealing to determine whether laid-off employee may receive seniority for time of layoff); Bokunewicz v. Purolator Prod., Inc., 907 F.2d 1396 (3rd Cir.1990) (can look to parol evidence to determine when employees' benefits vested); Manville Forest Prod., Inc. v. Paperworkers Union, 831 F.2d 72 (5th Cir.1987) (can look to past practices and negotiating history to determine whether company was obliged to fill "broke hustler" position if shut-down paper machine were reactivated); Machinists v. Sargent Indus., 522 F.2d 280 (6th Cir.1975) (can resort to parol evidence to elucidate meaning of term "sound actuarial basis" used in CBA). None of these cases dealt with the problem addressed in Gatliff Coal and presented here--whether to enforce a secret agreement that contradicts fundamental terms of a written CBA
 
 
 [1]
 My colleagues think it significant that I have not found a case disapproving Gatliff by name. Guilty as charged. Plea in mitigation: As other courts take no notice of Gatliff, there are no citations to collect. The Supreme Court has never cited Gatliff. No court of appeals has cited it since 1964, when Lewis v. Owens, 338 F.2d 740, 742 (6th Cir.1964), pointedly declined to rely on it. Gatliff has been cited by courts of appeals a total of three times: Clothing Workers v. NLRB, 324 F.2d 228, 231 (2d Cir.1963); Lewis v. Lowry, 322 F.2d 453, 456 (4th Cir.1963) (in banc), and Owens. Lowry, like Owens, cites Gatliff without endorsing its conclusion that labor policy bars oral agreements that would be permitted by the parol evidence rule. Clothing Workers includes Gatliff in a string citation for the proposition established in Heinz: that the employer must sign a formal document if the union demands one. Gatliff's conclusion that an employer may not withdraw from a unit after agreement has been reached is unimpeachable, given Bonanno and Retail Associates. The reason Gatliff gave has been abandoned, and the one that replaced it in Bonanno and Retail Associates does not assist the plaintiffs. A natural person missing for seven years is presumed dead. Justice Holmes remarked that "the reports of a given jurisdiction in the course of a generation take up pretty much the whole body of the law, and restate it from the present point of view." The Path of the Law, 10 Harv.L.Rev. 457, 458 (1897), reprinted in Collected Legal Papers 167, 169 (1920). Gatliff has been missing for seven years plus a generation, which speaks more eloquently than express disapproval
 
 
 [2]
 The majority insists, 945 F.2d at 899 n. 4, that cases such as Manville "hold only that parol evidence may be considered to resolve ambiguities or fill in gaps in a written collective bargaining agreement." This is the argument from triviality. More to come in the text below. Two observations here: First, none of the other courts of appeals believes that this matters. Second, I am baffled by the refrain that a reopener is specially grave because it "conflicts" with "fundamental" provisions of the agreement. With what provision does it conflict? If the reopener had been written down we would not say that the contract had an internal contradiction. A reopener is an option to bargain in mid-term, and options do not "conflict" with the provisions that control in the event they are not exercised. At all events, what I find significant about these cases is not that their subjects are grave or trivial, but that these courts hold that oral agreements trump written ones. The writing in Manville contained a zipper clause--language specifying that the pact was fully integrated and waiving all right to bargain during the term of the agreement. The court of appeals held that such a clause may be ignored. That is why these cases represent the polar opposite to the majority's position. They say that the parties cannot achieve an integrated collective bargaining agreement
 
 
 [3]
 In Houchens, for example, the union initially told the employer that "any contract proposal or recommendation would be subject to approval by the employees." 375 F.2d at 209. When the negotiators reached agreement, the company said it would await the employees' approval. At this point the union's negotiators insisted that the company implement the agreement without the employees' approval; the company balked; the Board found that the company had committed an unfair labor practice; the court of appeals enforced the order, explaining: "The purpose of collective bargaining is to fix wages, hours and conditions of work by a trade agreement between the employer and his employees.... This can be done satisfactorily only if a bargaining agent is selected to represent all the employees with full power to speak in their behalf. The purpose of the statute would be largely frustrated if the results of bargaining must be submitted to a vote of the employees, with all of the misunderstandings and cross currents that would inevitably arise in an election of that sort." 375 F.2d at 212, quoting from Darlington Veneer, 236 F.2d at 88. The reasons given in Houchens and Darlington Veneer sound remarkably like the reasons in my colleagues' opinion--except that the outcomes are diametrically opposed